335 U.S. 106 (1948)
UNITED STATES
v.
CONGRESS OF INDUSTRIAL ORGANIZATIONS ET AL.
No. 695.
Supreme Court of United States.
Argued April 28-29, 1948.
Decided June 21, 1948.
APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLUMBIA.
*107 Jesse Climenko argued the cause for the United States. With him on the brief were Solicitor General Perlman, Assistant Attorney General Quinn, Robert S. Erdahl and Beatrice Rosenberg.
Charles J. Margiotti and Lee Pressman argued the cause for appellees. With them on the brief was Frank Donner.
Briefs of amici curiae urging affirmance were filed by J. Albert Woll, Herbert S. Thatcher and James A. Glenn for the American Federation of Labor; Jerome Y. Sturm for the International Association of Machinists; Osmond K. Fraenkel, Arthur Garfield Hays and Burton A. Zorn for the American Civil Liberties Union; and Irving R.M. Panzer for the American Veterans Committee.
MR. JUSTICE REED delivered the opinion of the Court.
This appeal presents a problem as to the constitutionality of § 313 of the Federal Corrupt Practices Act of 1925, as amended by § 304 of the Labor Management Relations Act of 1947. Section 313 of the Federal Corrupt Practices Act now reads as stated in the margin.[1]
*108 An indictment was returned at the January 1948 term in the District Court of the United States for the District of Columbia on two counts charging in count I the Congress of Industrial Organizations and in count II its President, Philip Murray, with violation of § 313 of the Federal Corrupt Practices Act because of the publication and distribution in the District of Columbia of an issue, Vol. 10, No. 28, under date of July 14, 1947, of "The CIO News," a weekly periodical owned and published by the CIO at the expense and from the funds of the CIO and with the consent of its President, Mr. Murray. The number of "The CIO News" in question carried upon its front page a statement by Mr. Murray as President of the CIO, urging all members of the CIO to vote for Judge Ed Garmatz, then a candidate for Congress in Maryland at a special election to be held July 15, 1947. The statement said it was made despite § 313 in the belief that the section was unconstitutional because it abridged rights of free *109 speech, free press and free assemblage, guaranteed by the Bill of Rights.
The defendants moved to dismiss the indictment on the ground that § 313 as construed and applied and upon its face abridged as to the CIO and its members and Mr. Murray freedom of speech, press and assembly and the right to petition the Government for a redress of grievances in violation of the Constitution; that the classification of labor organizations was arbitrary and the provisions vague in contravention of the Bill of Rights; and that the terms of the section were an invasion of the rights of defendants, protected by the Ninth and Tenth Amendments. The District Court sustained the motion to dismiss on the ground that as "no clear and present danger to the public interest can be found in the circumstances surrounding the enactment of this legislation" the asserted abridgment of the freedoms of the First Amendment was unjustified.[2] 77 F. Supp. 355. In the order granting the motion to dismiss, the District Court defined its ruling as follows:
". . . that that portion of Section 313 of the Corrupt Practices Act, as amended by Section 304 of the Labor-Management Relations Act, 1947, which prohibits expenditures by any labor organization in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, is unconstitutional."
We accepted jurisdiction of the Government's appeal under the Criminal Appeals Act. 18 U.S.C. § 682.
*110 The briefs and arguments submitted to us support and attack the constitutionality of § 313 of the Federal Corrupt Practices Act on its face  at least so far as unconstitutionality is declared in the above order. We do not admit any duty in this Court to pass upon such a contention on an appeal under the Criminal Appeals Act except in cases of logical necessity. United States v. Petrillo, 332 U.S. 1. Although the case turned below on the constitutionality of the provision, the Criminal Appeals Act does not require us to pass upon the constitutionality of a federal statute where the indictment does not state an offense under its terms. United States v. L. Cohen Grocery Co., 255 U.S. 81, 88, 97. Compare United States v. Carbone, 327 U.S. 633. Our first obligation is to decide whether the indictment states an offense under § 313. As we hereafter conclude that this indictment does not charge acts embraced within its scope, this opinion is limited to that issue.
Indictment.  The presently essential parts of the indictment are set out in the margin.[3] It will be noted *111 that paragraph (3) does not allege the source of the CIO funds. The paragraph indicates on its face that "The CIO News" was a regularly published weekly periodical of which the challenged issue was Vol. 10, No. 28. The funds used may have been obtained from subscriptions of its readers or from portions of CIO membership dues, directly allocated by the members to pay for the "News," or from other general or special receipts.
We do not read the indictment as charging an expenditure by the CIO in circulating free copies to nonsubscribers, nonpurchasers or among citizens not entitled to receive copies of "The CIO News," as members of the union. The indictment, count I, paragraph (3), charged the CIO with making expenditures from its funds for "the cost of distribution" of the paper, in paragraph (6) (a), with paying approximately $100 for postal charges for the challenged issue and "causing said article to be distributed in the Third Congressional District of the State of Maryland and elsewhere in connection with the special election held in that Congressional District on the fifteenth day of July 1947." In paragraph (6) (b) there are allegations about certain extra copies. These are set out in the marginal note 3 supra. The extras we assume were published pursuant to the order of Mr. Murray in the article.[4] We conclude that the indictment charges nothing more as to the extras than that extra copies of the "News" *112 were published for distribution and were distributed in regular course to members or purchasers and that no allegation has been made of expenditures for "free" distribution of the paper to those not regularly entitled to receive it.
Scope of Section 313.  The construction of this section as applied to this indictment turns on the range of the word "expenditure," added to the section by § 304 of the Labor Management Relations Act of 1947, as indicated in note 1, supra. "Expenditure" as here used is not a word of art. It has no definitely defined meaning and the applicability of the word to prohibition of particular acts must be determined from the circumstances surrounding its employment. The reach of its meaning raised questions during congressional consideration of the bill when it contained the present text of the section. Did it cover comments upon political personages and events in a corporately owned newspaper? 93 Cong. Rec. 6438. Could unincorporated trade associations make expenditures? Id., 6439. Could a union-owned radio station give time for a political speech? Id., 6439. What of comments by a radio commentator? Id., 6439. Is it an expenditure only when A is running against B or is free, favorable publicity for prospective candidates illegal? Id., 6440. What of corporately owned religious papers supporting a candidate on moral grounds? The Anti-Saloon League? Id., 6440.
The purpose of Congress is a dominant factor in determining meaning.[5] There is no better key to a difficult problem of statutory construction than the law from which the challenged statute emerged. Remedial laws are to *113 be interpreted in the light of previous experience and prior enactments.[6] Nor, where doubt exists, should we disregard informed congressional discussion.[7]
Section 304 of the Labor Management Relations Act of 1947 is not a section without a history. Its earliest legislative antecedent was the Act of January 26, 1907, which provided:
"That it shall be unlawful for any national bank, or any corporation organized by authority of any laws of Congress, to make a money contribution in connection with any election to any political office. It shall also be unlawful for any corporation whatever to make a money contribution in connection with any election at which Presidential and Vice-Presidential electors or a Representative in Congress is to be voted for or any election by any State legislature of a United States Senator. .. ." 34 Stat. 864-65.
This legislation seems to have been motivated by two considerations. First, the necessity for destroying the influence over elections which corporations exercised through financial contribution.[8] Second, the feeling that corporate officials had no moral right to use corporate funds for contribution to political parties without the consent of the stockholders.[9]
The next important legislation was the Federal Corrupt Practices Act, 1925. This statute was the legislative *114 response to the decision of this Court in Newberry v. United States, 256 U.S. 232. Cf. United States v. Classic, 313 U.S. 299. The Newberry case held that federal limitation upon expenditures by candidates was unconstitutional as applied to expenditures made in the course of a primary election for the Senate.[10] While that case did not directly concern itself with the Act of 1907, it was widely construed to have invalidated all federal corrupt practices legislation relating to nominations. Therefore, the 1925 Act reenacted the earlier prohibitions against corporate contributions for political purposes with two significant changes. The phrase "money contribution" of 1907 was changed to read "contribution,"[11] and primaries and conventions were expressly excluded from the scope of the legislation.[12]
The statute immediately preceding § 304 in time was the War Labor Disputes Act of 1943.[13] This Act extended, for the duration of the war,[14] the prohibitions of *115 the Act of 1925 to labor organizations. Its legislative history indicates congressional belief that labor unions should then be put under the same restraints as had been imposed upon corporations. It was felt that the influence which labor unions exercised over elections through monetary expenditures should be minimized,[15] and that it was unfair to individual union members to permit the union leadership to make contributions from general union funds to a political party which the individual member might oppose.[16]
When Congress began to consider the Labor Management Relations Act of 1947 it had as a guide the 1944 presidential election, an election which had been conducted under the above amendment to the Act of 1925. In analyzing the experience of that election, a serious defect was found in the wording of the Act of 1925. The difficulty was that the word "contribution" was read narrowly by various special congressional committees investigating the 1944 and 1946 campaigns.[17] The concept of "contribution" was thought to be confined to direct gifts or direct payments.[18] Since it was obvious that the statute as construed could easily be circumvented through indirect contributions, § 304 extended the prohibition of § 313 to "expenditures."[19]
The Labor Management Relations Act of 1947 was the subject of extensive debates in Congress. Embracing as *116 it did a number of controversial issues, the discussion necessarily covered a wide range. It is not surprising, therefore, to find congressional explanation of the intended scope of the specific provision of § 304, in issue here, scanty and indecisive. We find, however, in the Senate debates definite indication that Congress did not intend to include within the coverage of the section as an expenditure the costs of the publication described in the indictment. As we have stated above, there are numerous suppositional instances of acts by corporations or unions that approach the border line of the expenditures that are declared unlawful by § 313 of the Corrupt Practices Act. As we are dealing on this appeal with the scope of § 313 as applied to an indictment that charges certain allegedly illegal acts, we propose to confine our examination of legislative history to the statements that tend to show whether the congressional purpose was to forbid the challenged publication. For example, Senator Taft, the Chairman of the Committee on Labor and Public Welfare, and one of the conferees for the Senate, answered inquiries as follows (93 Cong. Rec. 6437, 6438, 6440):
"Mr. BARKLEY. Suppose the particular publication referred to by the Senator from Florida is published and paid for by subscriptions paid to the publication by the membership of that railway labor organization?
"Mr. TAFT. That will be perfectly lawful. That is the way it should be done.
"Mr. BARKLEY. And suppose it is not paid for by union funds collected from the various labor unions?
"Mr. TAFT. That will be perfectly proper.
.....
"Mr. BARKLEY. The Senator from Ohio referred to the law prohibiting the making of direct or indirect *117 contributions by corporations as a justification for making the same provision in the case of labor unions. Let us consider the publication of a corporation which, day after day, takes a position against one candidate and in favor of another candidate, and does so in its editorials. The editorials occupy space in that newspaper or publication, and the space costs a certain amount of money. Is that a direct or an indirect contribution to a campaign; and if it is neither, what is it?
"Mr. TAFT. I would say that is the operation of the newspaper itself.
"Mr. BARKLEY. That is true; it is the operation of the newspaper. But I gathered the impression that in referring to the present law prohibiting the making of contributions, directly or indirectly by corporations, the Senator inferred that if a corporation publishes a newspaper  as most of them do  and uses the editorials in that publication in advocacy of or opposition to any candidate, at least that is a direct contribution to the campaign. It could not be anything else.
"Mr. TAFT. I do not think it is either a direct or an indirect contribution. I do not think it is an expenditure of the sort prohibited, because it seems to me it is simply the ordinary operation of the particular corporation's business.
.....
"Mr. BARKLEY. Mr. President, let me ask the Senator this question: Let us suppose a labor organization publishes a newspaper for the information and benefit of its members, and let us suppose that it is published regularly, whether daily or weekly or monthly, and is paid for from a fund created by the payment of dues into the organization it represents. Let us assume that the newspaper is not sold *118 on the streets, and let us assume further that a certain subscription by the month or by the year is not charged for the newspaper. Does the Senator from Ohio advise us that under this measure such a newspaper could not take an editorial position with respect to any candidate for public office, without violating this measure?
"Mr. TAFT. If it is supported by union funds, I do not think it could. If the newspaper is prepared and distributed and circulated by means of the expenditure of union funds, then how could a line be drawn between that and political literature or pamphlets or publications of that nature? It is perfectly easy for a labor union to publish lawfully a bona fide newspaper and to charge subscriptions for that newspaper, either by itself or as a corporation.
.....
"Mr. BALL. In the case of most union papers, as I understand, the subscriptions from the union members are collected along with the dues, but they are an earmarked portion of the dues which the union collects and remits to the paper in the form of subscriptions. I take it that would be in a different category from the case where the union makes a blanket subscription and an appropriation out of union dues.
"Mr. TAFT. I think if the paper is, so to speak, a going concern, it can take whatever position it wants to.
.....
"Mr. MAGNUSON. Teamsters' unions publish newspapers dealing with matters in which such unions are interested. The same is true of many other unions. If the pending measure becomes a law, from now on such unions will be prohibited from advocating *119 in their newspapers the support of any political candidates.
"Mr. TAFT. That is correct, unless they sell the papers they publish to their members, if the members desire to buy them. In such a case there would be no expenditure for such a purpose of union funds.
.....
"Mr. MAGNUSON. Mr. President, if the Senator will yield, let me ask him another question. All the funds of labor unions come from dues paid by their members. All the activities of the unions are based upon expenditure of funds provided by dues. That money is in the union's treasury. If the pending bill should become law it would mean that all labor organs which are now in existence would, from now on, be prohibited from participating in a campaign, favoring a candidate, mentioning his name, or endorsing him for public office?
"Mr. TAFT. No; I do not think it means that. The union can issue a newspaper, and can charge the members for the newspaper, that is, the members who buy copies of the newspaper, and the union can put such matters in the newspaper if it wants to. The union can separate the payment of dues from the payment for a newspaper if its members are willing to do so, that is, if the members are willing to subscribe to that kind of a newspaper. I presume the members would be willing to do so. A union can publish such a newspaper, or unions can do as was done last year, organize something like the PAC, a political organization, and receive direct contributions, just so long as members of the union know what they are contributing to, and the dues which they pay into the union treasury are not used for such purpose."
*120 Senator Ellender, also one of the conferees, made this statement:
"May I say to the Senator from Florida it is only in the event that union funds are used for political contributions that a union becomes liable. Mr. Green can talk all he wants to, if he pays for his own time or if the members of the union desire to make individual contributions for such a purpose. For another thing, most unions operate and manage newspapers, and the most of them are maintained by advertisements or by subscriptions from members of the union and from other sources. The proceeds from such newspapers are not union funds. In such cases these newspapers can print anything they desire, and they will not violate the law, so long as union funds are not used to pay for the operation of those newspapers for political purposes." 93 Cong. Rec. 6522.
Application.  With this summary of the development of and quotation of excerpts from discussion in Congress concerning § 313, we turn to its interpretation and a determination as to whether it covers the circumstances charged in the indictment. Some members of the Court, joining in this opinion, do not place the reliance upon legislative history that this opinion evidences, but reach the same conclusion without consideration of that history. From what we have previously noted, it is clear that Congress was keenly aware of the constitutional limitations on legislation and of the danger of the invalidation by the courts of any enactment that threatened abridgment of the freedoms of the First Amendment. It did not want to pass any legislation that would threaten interferences with the privileges of speech or press or that would undertake to supersede the Constitution. The obligation rests also upon this Court in construing congressional enactments to *121 take care to interpret them so as to avoid a danger of unconstitutionality.[20]
If § 313 were construed to prohibit the publication, by corporations and unions in the regular course of conducting their affairs, of periodicals advising their members, stockholders or customers of danger or advantage to their interests from the adoption of measures, or the election to office of men espousing such measures, the gravest doubt would arise in our minds as to its constitutionality.[21] In so far as some of the many statements made on the floor of Congress may indicate the thought, at the time, by certain members of Congress that the language of § 313 *122 carried a restrictive meaning in conflict with that which we have adopted, we hold that the language itself, coupled with the dangers of unconstitutionality, supports the interpretation which we have placed upon it.
When Congress coupled the word "expenditure" with the word "contribution," it did so because the practical operation of § 313 in previous elections showed the need to strengthen the bars against the misuse of aggregated funds gathered into the control of a single organization from many individual sources. Apparently "expenditure" was added to eradicate the doubt that had been raised as to the reach of "contribution," not to extend greatly the coverage of the section.[22] One can find indications in the exchanges between participants in the debates that informed proponents and opponents thought that § 313 went so far as to forbid periodicals in the regular course of publication from taking part in pending elections where there was not segregated subscription, advertising or sales moneys adequate for its support. Of course, a periodical financed by a corporation or labor union for the purpose of advocating legislation advantageous to the sponsor or supporting candidates whose views are believed to coincide generally with those deemed advantageous to such organization is on a different level from newspapers devoted solely to the dissemination of news but the line separating the two classes is not clear. In the absence of definite statutory demarcation, the location of that line must await the full development of facts in individual cases. It is one thing to say that trade or *123 labor union periodicals published regularly for members, stockholders or purchasers are allowable under § 313 and quite another to say that in connection with an election occasional pamphlets or dodgers or free copies widely scattered are forbidden. Senator Taft stated on the Senate floor that funds voluntarily contributed for election purposes might be used without violating the section and papers supported by subscriptions and sales might likewise be published.[23] Members of unions paying dues and stockholders of corporations know of the practice of their respective organizations in regularly publishing periodicals. It would require explicit words in an act to convince us that Congress intended to bar a trade journal, a house organ or a newspaper, published by a corporation, from expressing views on candidates or political proposals in the regular course of its publication. It is unduly stretching language to say that the members or stockholders are unwilling participants in such normal organizational activities, including the advocacy thereby of governmental policies affecting their interests, and the support thereby of candidates thought to be favorable to their interests.
It is our conclusion that this indictment charges only that the CIO and its president published with union funds a regular periodical for the furtherance of its aims, that President Murray authorized the use of those funds for distribution of this issue in regular course to those accustomed to receive copies of the periodical and that the issue with the statement described at the beginning of this opinion violated § 313 of the Corrupt Practices Act.
We are unwilling to say that Congress by its prohibition against corporations or labor organizations making an "expenditure in connection with any election" of candidates for federal office intended to outlaw such a publication. *124 We do not think § 313 reaches such a use of corporate or labor organization funds. We express no opinion as to the scope of this section where different circumstances exist and none upon the constitutionality of the section.
Our conclusion leads us to affirm the order of dismissal upon the ground herein announced.
It is so ordered.
MR. JUSTICE FRANKFURTER, concurring.
In a government operating under constitutional limitations there are obvious advantages in knowing at once the legal powers of the government. The desire to secure these advantages explains the strong efforts of some of the ablest members of the Philadelphia Convention to associate the judiciary through a Council of Revision in the legislative process.[1] The efforts failed, because the disadvantages of such a role by the judiciary were deemed greater than the advantages. And it cannot be too often recalled that the first Chief Justice and his Associates felt constrained to withhold even from the Father of his Country answers to questions regarding which Washington was most anxious to have illumination from the Supreme Court, pertaining as they did to the President's powers during the Napoleonic conflict. See 3 Johnston, Correspondence and Public Papers of John Jay (1891) 486-89, and 10 Sparks, Writings of Washington (1847) 542-45; and see Thayer, Legal Essays (1908) 53-54.
Accordingly, the fact that it would be convenient to the parties and the public to know promptly whether a statute is valid, has not affected "rigid insistence" on limiting adjudication to actual "cases" and "controversies." To that end the Court has developed "for its own governance *125 in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Mr. Justice Brandeis, concurring, in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345, 346. See also, more recently, Alabama State Federation of Labor v. McAdory, 325 U.S. 450; Alma Motor Co. v. Timken-Detroit Axle Co., 329 U.S. 129; United Public Workers of America v. Mitchell, 330 U.S. 75; Rescue Army v. Municipal Court, 331 U.S. 549.
A case or controversy in the sense of a litigation ripe and right for constitutional adjudication by this Court implies a real contest  an active clash of views, based upon an adequate formulation of issues, so as to bring a challenge to that which Congress has enacted inescapably before the Court. The matter was thus put by an authoritative commentator: "The determination of constitutional questions has been associated with the strictly judicial function and so far as possible has been removed from the contentions of politics. These questions have been decided after full argument in contested cases and it is only with the light afforded by a real contest that opinions on questions of the highest importance can safely be rendered." Charles Evans Hughes, The Supreme Court of the United States (1928) 32. Time has not lessened the force of the reason for this requirement of abstention as indicated by Chief Justice Marshall: "No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed." Ex parte Randolph, 20 Fed. Cas. No. 11,558 at 254, 2 Brock. 447, 478-79 (C.C.D. Va. 1833).
*126 In order that a contest may fairly invite adjudication it is not necessary that the parties should be personally inimical to one another. On the other hand, the fact that the outward form of a litigation has not been contrived by pre-arrangement of the parties does not preclude want of a real contest which is essential to this Court's exercise of its function, one of "great gravity and delicacy," in passing upon the validity of an act of Congress. Ashwander v. Tennessee Valley Authority, supra, at 345 and cases cited in footnote 3. This prerequisite may be lacking though there be entire disinterestedness on both sides in their desire to secure at the earliest possible moment an adjudication on constitutional power. It may be lacking precisely because the issues were formulated so broadly as to bring gratuitously before the Court that for which there is no necessity for decision, or because they invite formulation of a rule of constitutional law broader than is required by the precise facts of the situation or the terms of the assailed legislation. See Liverpool, N.Y. and Phila. S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39; see also, Statement of the United States of America as Amicus Curiae, in Burco, Inc. v. Whitworth, 297 U.S. 724; Government's Brief in Landis v. North American Co., 299 U.S. 248.
We are concerned here not with derogatory implications of collusion, nor have we a case of mootness with its technical meaning of a non-existent controversy. The circumstances bring the present record within those considerations which have led this Court in the past "for its own governance in the cases confessedly within its jurisdiction" to avoid passing on grave constitutional questions because the questions involving the power of Congress come here not so shaped by the record and by the proceedings below as to bring those powers before this Court as leanly and as sharply as judicial judgment upon an exercise of congressional power requires.
*127 This case is here under the unique jurisdiction of the Criminal Appeals Act of 1907, as amended, whereby decisions of District Courts raise almost abstract questions of law regarding the invalidity or construction of criminal statutes, in that they do not come here in the setting of normal adjudications on the merits of a controversy. Compare United States v. Petrillo, 332 U.S. 1, with the subsequent adjudication on the merits in United States v. Petrillo, 75 F. Supp. 176. It is most important that such a decision result from due weighing of the considerations which alone can justify the invalidation of an Act of Congress. This implies that there be presented to a District Court the most effective and the least misapprehending legal grounds for supporting what Congress has enacted, while at the same time constitutional adjudication is sedulously resisted by presenting to the District Court alternative constructions of what Congress has written so as to avoid, if fairly possible, invalidation of the statute. The decision of the District Court in this case comes to us wanting in both respects.
According to the District Court, the Government conceded that § 304 of the Taft-Hartley Act is an abridgment of "rights guaranteed by the First Amendment" but contended that "Congress has power under Article I, Section 4, of the Constitution to abridge First Amendment rights if it considers such a course necessary in maintaining the purity and freedom of elections." This representation of the Government's argument below is made in the opinion of the District Court not once, not twice, but thrice.[2] At the bar of this Court it was urged on behalf of the Government that the District Court misconceived the arguments of the Government that what *128 the District Court attributed to the Government is not what the Government argued below. But ordinary English words have lost all meaning if the District Judge does not say unequivocally and three times that that is what the Government has argued. It cannot be whistled away as a gauche manner of saying that inasmuch as utterance may under certain circumstances be restricted, § 304 is not in violation of the First Amendment. That may have been the argument put to the court below, but plainly enough that court did not so understand it. Who is to say how the lower court would have dealt with the problem of constitutionality before it, if the argument had been pitched differently than in the way in which it reached the court, or if the court's misapprehension had been corrected? No effort was made, by the familiar process of a petition for rehearing or for a clarification of the court's opinion, to see to it that the lower court manifested an understanding of the Government's contentions by not attributing an erroneous position to the Government. (See, for instance, petition for rehearing in Morgan v. United States, 304 U.S. 1, 23.)
Again, the defendants did not urge below, as is ordinarily the way of defendants, a construction of the statute *129 which would afford them the rights they claim  but would secure those rights not by declaring an Act of Congress unconstitutional but by an appropriate restriction of its scope. On its own motion, this Court now gives a construction to the statute which takes the conduct for which defendants were indicted out of the scope of the statute without bringing the Court into conflict with Congress. Who can be confident that such a construction, which salvages the statute and at the same time safeguards the constitutional rights of the defendants, might not have commended itself to the District Court and eventually brought a different case, if any, before this Court for review?
I cannot escape the conclusion that in a natural eagerness to elicit from this Court a decision at the earliest possible moment, each side was at least unwittingly the ally of the other in bringing before this Court far-reaching questions of constitutionality under circumstances which all the best teachings of this Court admonish us not to entertain.
But since my brethren find that the case calls for adjudication, I join in the Court's opinion. I do so because of another rule of constitutional adjudication which requires us to give a statute an allowable construction that fairly avoids a constitutional issue. See my dissenting opinion in Shapiro v. United States, ante, p. 36, decided this day.
MR. JUSTICE RUTLEDGE, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join, concurring in the result.
If § 313 as amended[1] can be taken to cover the costs of any political publication by a labor union, I think it comprehends *130 the "expenditures" made in this case. By reading them out of the section, in order not to pass upon its validity, the Court in effect abdicates its function in the guise of applying the policy against deciding questions of constitutionality unnecessarily.[2] I adhere to that policy. But I do not think it justifies invasion of the legislative function by rewriting or emasculating the statute. This in my judgment is what has been done in this instance. Accordingly I dissent from the construction given to the statute and from the misapplication of the policy. I also think the statute patently invalid as applied in these circumstances.

I.
The Court's interpretation of the section and the indictment are not entirely clear to me. But, as I understand the ruling, it is only that § 313 does not forbid labor unions to take part in pending elections[3] by publishing and circulating newspapers in regular course among their membership, although the costs of publication are paid from the union's general funds regardless of their source, i.e., whether from subscriptions, advertising revenues and returns from per copy sales, or from union dues and other sources.
The line of coverage is marked without reference to the source from which the union derives the funds so *131 expended,[4] but by whether others than members of the union receive free copies of the publication; and by whether the publication is "in regular course" or only in casual or occasional distributions. Apparently, in the latter event, circulation limited to the membership would fall within the prohibition as well as free (and perhaps also paid) distribution outside that circle.
The construction therefore comes down to finding that Congress did not intend to forbid these expenditures, though made from union funds, since tley were made: (1) to sustain the publication of the union's political views; (2) in the regular course of publishing and distributing a union newspaper; (3) with distribution limited substantially[5] to union members and not including outsiders. It is because applying § 313 to this type of expenditure would raise "the gravest doubt" of the section's constitutionality that the Court holds the section inapplicable.
If such an interpretation were tenably supportable on any other basis, I should be in accord with this happy solution. But neither the language of the section nor its history affords such a basis, unless indeed it may be *132 that the wording is so broad, comprehensive, and indefinite that any possible construction which would apply to a union's publication of its political views would be subject to equally grave constitutional doubt, and therefore was not intended to be covered.
Indeed, so far as the present opinion concludes, that may be the case. For it does not hold that distribution outside the circle of membership, even in regular course, is forbidden or, if so, the prohibition would be constitutionally permissible. Neither does it rule that either consequence would follow from casual or occasional distribution within or without that circle. At the most it is indicated that the section more probably or possibly covers those situations than the one now eliminated. But there seems to be no corresponding intimation that the section would be valid in such coverage.
In fact the opinion points to no situation, relating to a union's expression of political views, which certainly could be taken as included and validly so. This, of course, comes down to excluding the present circumstances, not to save the statute because there are other applications clearly and validly covered, but because there are such applications which may or may not be covered and which, if covered, may be equally or nearly as doubtful constitutionally. Such a course of construction, if followed in each instance of indictment on particular facts, would mean that the section could not apply in any instance of publication, because each would present "the gravest doubt" of constitutionality and therefore would be excluded.
The language of § 313, as amended, is sweepingly comprehensive. Insofar as presently pertinent it forbids labor unions as well as corporations ". . . to make a contribution or expenditure in connection with any election at which . . . [the designated federal officers][6] are to be *133 voted for," including primaries, conventions or caucuses held to select such candidates. (Emphasis added.)
The crucial words are "expenditure" and "in connection with." Literally they cover any expenditure whatever relating at any rate to a pending election, and possibly to prospective elections or elections already held. The broad dictionary meaning of the word "expenditure" takes added color from its context with "contribution." The legislative history is clear that it was added by the 1947 amendment expressly to cover situations not previously included within the accepted legislative interpretation of "contribution."[7] The coloration added is therefore not restrictive; it is expansive. See note 9. And in the absence of any indication of restriction, light on *134 the scope of coverage can be found only in the legislative history.
When one turns to that source, he finds a veritable fog of contradictions relating to specific possible applications,[8] contradictions necessarily bred among both proponents and opponents of the amendment from the breadth and indefiniteness of the literal scope of the language used. But in one important respect the history again is clear, namely, that the sponsors and proponents had in mind three principal objectives.
These were: (1) To reduce what had come to be regarded in the light of recent experience as the undue and disproportionate influence of labor unions upon federal elections; (2) to preserve the purity of such elections and of official conduct ensuing from the choices made in them against the use of aggregated wealth by union as well as corporate entities; and (3) to protect union members holding political views contrary to those supported by the union from use of funds contributed by them to promote acceptance of those opposing views.[9] Shortly, *135 these objects may be designated as the "undue influence," "purity of elections," and "minority protection" objectives. They are obviously interrelated, but not identical. And the differences as well as their combination become important for deciding the scope of the section's coverage and its validity in specific application.
With those objects in mind as throwing light on the section's coverage under the broad language employed, we turn to the legislative history on that subject. The Government centers the discussion, both on coverage and on constitutionality, around the "minority protection" objective. And the legislative discussion, taking place almost exclusively in the Senate and dominated largely by the Labor Management Act's sponsor in that body, also took this purpose as the central theme.[10]
The discussion ranged around a great variety of possible specific applications,[11] with concentration upon both *136 the scope and the validity of the provision. The Senate sponsor responded to a flood of inquiries with candor and so far as possible with precision and certainty concerning particular situations under his view of the section's criterion,[12] although in numerous instances he was equally candid in stating doubt or disability to give positive opinions, at times in the absence of further facts.[13]
*137 What is most significant for the question of coverage, however, and for the Court's construction in this case, is the fact that in making his responses to the numerous and varied inquiries he tested coverage invariably or nearly so by applying the very criterion the Court now discards, namely, the source of the funds received and expended in making the political publication.
That is, in his view that the primary purpose of the amendment was "minority protection," the line drawn by the section was between expenditure of funds received by the union expressly for the purpose of the publication and earmarked for that purpose and, on the other hand, expending funds not so limited by the person or source supplying them.[14] There was strong opposition to the *138 provision and spirited exchange between proponents and critics of the measure concerning its wisdom and its constitutionality. But there was no disagreement among them that the sponsor's test was the intended criterion. Indeed the legislative discussion was stated explicitly to be for the purpose of making plain beyond any question that this was so.[15] Although there were many differences over whether specified types of activity would fall under the criterion's ban and doubts concerning others, the purpose succeeded. There was no divergence from the view that political comment by a union paper or other instrumentality using nonsegregated funds was within the section's coverage. When this was the source of the expenditure it violated the intended prohibition of the section whether or not the publication was in regular course and whether or not it went to others than members and persons accustomed to receive it.
If therefore the sponsor's steadfast view can have weight to determine the coverage of a statute indefinite in its terms, Wright v. Vinton Branch, 300 U.S. 440; United States v. Dickerson, 310 U.S. 554; United States v. American Trucking Assns., 310 U.S. 534; United States v. Wrightwood Dairy Co., 315 U.S. 110, this case is brought squarely within the prohibition of § 313. This is conclusively established by the excerpts from the legislative discussion quoted in the Court's opinion. Others to the same effect are added to this one as an appendix.
Moreover in his message vetoing the Labor Management Relations Act of 1947 the President stated that § 313 "would prevent the ordinary union newspaper from commenting favorably or unfavorably upon candidates or issues in national elections." H.R. Doc. No. 334, 80th *139 Cong., 1st Sess. 9. In the debate preliminary to the overriding of the veto, none of the legislators in charge of the measure gave any indication that they differed with the President's interpretation. Nor could they have differed, for the statement in the veto message gave effect to their clearly expressed views as to the section's coverage in the specific instance stated.
Thus, in the face of the legislative judgment, reiterated after veto, and of the Chief Executive's in making his veto, this Court sets aside the one clearly intended feature of the statute apart from its general objectives. I doubt that upon any matter of construction the Court has heretofore so far presumed to override the plainly and incontrovertibly stated judgment of all participants in the legislative process with its own tortuously fashioned view. This is not construction under the doctrine of strict necessity. It is invasion of the legislative process by emasculation of the statute. The only justification for this is to avoid deciding the question of validity.

II.
We are concerned in this case with the constitutionality of § 313 as amended only insofar as it may be applied in restriction or abridgment of the rights of freedom of speech, press and assembly secured by the First Amendment.[16] Other applications are not in question. There can be little doubt of Congress' power to regulate the making of political contributions and expenditures by labor unions, as well as by other organizations and individuals, in the interest of free and pure elections and the prevention of official corruption, by appropriate measures not trenching on those basic rights. But when regulation *140 or prohibition touches them, this Court is duty bound to examine the restrictions and to decide in its own independent judgment whether they are abridged within the Amendment's meaning.[17] That office cannot be surrendered to legislative judgment, however weighty, although such judgment is always entitled to respect.
As the Court has declared repeatedly, that judgment does not bear the same weight and is not entitled to the same presumption of validity, when the legislation on its face or in specific application restricts the rights of conscience, expression and assembly protected by the Amendment, as are given to other regulations having no such tendency.[18] The presumption rather is against the legislative intrusion into these domains. For, while not absolute, the enforced surrender of those rights must be justified by the existence and immediate impendency of dangers to the public interest which clearly and not dubiously outweigh those involved in the restrictions upon the very foundation of democratic institutions, grounded as those institutions are in the freedoms of religion, conscience, expression and assembly. Hence doubtful intrusions cannot be allowed to stand consistently with the Amendment's command and purpose,[19] nor therefore can the usual presumptions of constitutional validity, deriving from the weight of legislative opinion in other matters more largely within the legislative province and special competence, obtain. It is in the light and spirit of these principles that the validity *141 of § 313 as claimed to be applicable here must be determined.
At the outset the Government admits that § 313, in prohibiting expenditures in connection with any federal election, does "bring into play" the rights of freedom of speech, press and assembly. This is a necessary consequence of its construction of the section and the presently attempted application. But it is claimed no unconstitutional abridgment is involved. This, because it is said Congress has power to act to preserve the freedom and purity of federal elections under Art. I, § 4, of the Constitution,[20] and of official action. Thus it is claimed the First Amendment's guaranties are balanced by this other constitutional provision; and Congress' exercise of the authority granted by it is entitled to the same weight and presumptive validity in placing limits upon the freedoms as attaches in their favor in other connections. Accordingly, the usual preeminence accorded to the First Amendment liberties disappears, it is said, and the legislative judgment, having rational basis in fact and policy, becomes controlling.
Apart from the question whether the same argument might not be applicable to all other powers granted to Congress by the Constitution, to destroy the principles stated for securing the preferential status of the First Amendment freedoms, the argument ignores other equally settled corollary principles. These are that statutes restrictive of or purporting to place limits to those freedoms must be narrowly drawn to meet the precise evil the legislature seeks to curb, Cantwell v. Connecticut, 310 U.S. *142 296; Thornhill v. Alabama, 310 U.S. 88; Schneider v. State, 308 U.S. 147; De Jonge v. Oregon, 299 U.S. 353; Saia v. New York, 334 U.S. 558, and that the conduct proscribed must be defined specifically so that the person or persons affected remain secure and unrestrained in their rights to engage in activities not encompassed by the legislation. Blurred signposts to criminality will not suffice to create it. Cantwell v. Connecticut, supra; Stromberg v. California, 283 U.S. 359; cf. Thomas v. Collins, 323 U.S. 516; Winters v. New York, 333 U.S. 507.
Section 313 falls far short of meeting these requirements, both in its terms and as infused with meaning from the legislative history. This is true whether the section is considered in relation to one or another of the evils said to be its targets or with reference to all of them taken together.
If the evil is taken to be the corruption of national elections and federal officials by the expenditure of large masses of aggregated wealth in their behalf, the statute is neither so phrased nor so limited, even in its legislative construction. Indeed the Government does not explicitly argue corruption per se arising from union expenditures for publication in the same sense as gave rise to the original and later legislation against corporate contributions down to the War Labor Disputes Act of 1943. And very little in the legislative history directly suggests this evil, although there are inferences implicit in some statements that it was not entirely out of mind.[21] So also with the Government's argument.[22]
*143 The Government stresses the "undue influence" of unions in making expenditures by way of publication in support of or against candidates and political issues involved in the campaign rather than corruption in the gross sense. It maintains that large expenditures by unions in publicizing their official political views bring about an undue, that is supposedly a disproportionate, sway of electoral sentiment and official attitudes. In short, the "bloc" power of unions has become too great, in influencing both the electorate and public officials, to permit further expenditure of their funds in directly and openly publicizing their political views. And the asserted evil is to be uprooted by prohibition of union expenditures as such, not by regulation specifically drawn to meet it.
There are, of course, obvious differences between such evils and those arising from the grosser forms of assistance more usually associated with secrecy, bribery and corruption, direct or subtle. But it is not necessary to stop to point these out or discuss them, except to say that any asserted beneficial tendency of restrictions upon expenditures for publicizing political views, whether of a group or of an individual, is certainly counterbalanced to some extent by the loss for democratic processes resulting from the restrictions upon free and full public discussion. The claimed evil is not one unmixed with good. And its suppression destroys the good with the bad unless precise measures are taken to prevent this.
The expression of bloc sentiment is and always has been an integral part of our democratic electoral and legislative processes. They could hardly go on without it. Moreover, to an extent not necessary now to attempt delimiting, that right is secured by the guaranty of freedom of *144 assembly, a liberty essentially coordinate with the freedoms of speech, the press, and conscience. Cf. Bowe v. Secretary of the Commonwealth, 320 Mass. 230, 251-252. It is not by accident, it is by explicit design, as was said in Thomas v. Collins, supra at 530, that these freedoms are coupled together in the First Amendment's assurance. They involve the right to hear as well as to speak, and any restriction upon either attenuates both.
There is therefore an effect in restricting expenditures for the publicizing of political views not inherently present in restricting other types of expenditure, namely, that it necessarily deprives the electorate, the persons entitled to hear, as well as the author of the utterance, whether an individual or a group, of the advantage of free and full discussion and of the right of free assembly for that purpose.
The most complete exercise of those rights is essential to the full, fair and untrammeled operation of the electoral process. To the extent they are curtailed the electorate is deprived of information, knowledge and opinion vital to its function. To say that labor unions as such have nothing of value to contribute to that process and no vital or legitimate interest in it is to ignore the obvious facts of political and economic life and of their increasing interrelationship in modern society. Cf. DeMille v. American Federation of Radio Artists, 31 Cal.2d 137. That ostrichlike conception, if enforced by law, would deny those values both to unions and thus to that extent to their members, as also to the voting public in general. To compare restrictions necessarily resulting in this loss for the public good to others not creating it is to identify essentially different things. The cases are not identical. The loss inherent in restrictions upon expenditures for publicizing views is not necessarily involved in other expenditures.
It is this very difference, of course, which brings into play the First Amendment's prohibitions and the principles *145 giving them presumptive weight against intrusions or encroachments upon the area the Amendment reserves against legislative annexation. It is this difference, the very fact that the restriction seeks to contract the boundaries of expression and the right to hear previously considered open, which forces upon its authors the burden of justifying the contraction by demonstrating indubitable public advantage arising from the restriction outweighing all disadvantages, thus reversing the direction of presumptive weight in other cases.
If therefore it is an evil for organized groups to have unrestricted freedom to make expenditures for directly and openly publicizing their political views and information supporting them, but cf. Bowe v. Secretary of the Commonwealth, supra at 252, it does not follow that it is one which requires complete prohibition of the right. Ibid. That is neither consistent with the Amendment's spirit and purpose, ibid., nor essential to correction of the evil, whether it be considered corruptive influence or merely influence of undue or disproportionate political weight.
It is not necessary now to consider whether restricting the rights of individuals, singly or in organized relationships, to publicize their political views, rights often essential to their survival and always to their well-being, can be accommodated, in some instances, with the Amendment's purpose or justified because in legislative judgment those persons, unless restricted, acquire "undue influence" in the electoral process. For "undue influence" in this connection may represent no more than convincing weight of argument fully presented, which is the very thing the Amendment and the electoral process it protects were intended to bring out. And one may question how far legislators may go in accurately assessing undue or disproportionate weight as distinguished from making substantially accurate findings and conclusions concerning corruption.
*146 But even if the right to sway others by persuasion is assumed to be subject to some curtailment, in the interest of preventing grossly unbalanced presentations, that right cannot be wholly denied, Bowe v. Secretary of the Commonwealth, supra at 252; nor can it be restricted beyond what is reasonably and clearly necessary to correct an evil so gross and immediate that the correction indubitably outweighs the loss to the public interest resulting from the restriction.
Here the restriction in practical effect is prohibition, not regulation, when it is considered with respect to the objects of suppressing corruption and "undue influence." It is not a limitation, it is a prohibition upon expenditure of union funds in connection with a federal election. Unions can act and speak today only by spending money, as indeed is true of nearly every organization and even of individuals if their action is to be effective. As was said in the course of the Senate debates, the interdiction applies to "a dollar, or 50 cents, or $500 or $1,000." 93 Cong. Rec. 6438. There is no showing, legislative or otherwise, of corruption so widespread or of "undue influence" so dominating as could possibly justify so absolute a denial of these basic rights. The statute, whether in terms or as given meaning by the legislative history, is not narrowly drawn to meet the precise evils of corruption or "undue influence," if these were the controlling objects of the legislation. Nor, as will appear, were the restrictions specifically defined, if they can be considered to have been defined at all, so as to leave the union secure and unrestrained in the right to engage in activities within the region of the First Amendment's coverage but not encompassed by the legislation.
As has been stated, it was the "minority protection" idea which became the dominantly stressed one in the Senate debates, although at the most § 313 on its face gave only slight suggestion of this purpose. Nor was *147 there indication in the section's terms that its prohibition turns on the source from which the funds expended were derived. The language bearing on this was "expenditure in connection with an election" and no more. Literally all union expenditures in that connection were outlawed. There is not a word to suggest that unions could spend their funds in that manner if contributed expressly for the purpose or derived from such sources as advertising revenues, subscriptions, etc., received in connection with publication of a paper in regular course or otherwise. The limitation of the prohibition to funds received generally, i. e., without specific designation for use in political publicity, is almost wholly a construction of the Senate sponsor, so far as appears from the legislative history.
Notwithstanding accepted canons of statutory construction, it certainly would be going far to expect laymen, or even lawyers, to read a statute so lacking in specificity concerning its basic criterion with any semblance of understanding of its limitations.
The lawyer might indeed read the Congressional Record and conclude that the source of the funds used was the crux. But even he would be left in broad and deep doubt whether it would turn multitudinous situations one way or the other. If the section is taken nevertheless to have been intended to draw the sponsor's line of distinction, the restriction it makes remains a drastic one. The effect is not merely one of minority protection. It is also one of majority prohibition. Cf. DeMille v. American Federation of Radio Artists, supra. Under the section as construed, the accepted principle of majority rule which has become a bulwark, indeed perhaps the leading characteristic, of collective activities is rejected in favor of atomized individual rule and action in matters of political advocacy. Ibid. Union activities in political publicity are confined to the use of funds received *148 from members with their explicit designation given in advance for the purpose.[23] Funds so received from members can be thus expended and no others. Even if all or the large majority of the members had paid dues with the general understanding that they or portions of them would be so used, but had not given explicit authorization, the funds could not be so employed.[24] And this would be true even if all or the large majority were in complete sympathy with the political views expressed by the union or on its behalf with any expenditure of money, however small.
It is true that the union could ask and in many instances secure the required explicit assents. It seems to be suggested that this might be done by expressly designating a specific portion of the dues for political uses, possibly though not at all clearly by by-law or constitutional provision, possibly by earmarking upon statements of dues payable. But it is not made clear whether the member could refuse to pay the earmarked portion and retain membership or would have to pay it to remain in that status. If the latter is true, the section affords little real "minority protection"; if the former, the dissentient is given all the benefit derived from the union's political publicity without having to pay any part of its cost. This is but another of the important and highly doubtful questions raised on the section's wording and construction.
*149 The section does not merely deprive the union of the principle of majority rule in political expression.[25] Cf. DeMille v. American Federation of Radio Artists, supra. It rests upon the presumption that the majority are out of accord with their elected officials in political viewpoint and its expression and, where that presumption is not applicable, it casts the burden of ascertaining minority or individual dissent not upon the dissenters but upon the union and its officials. The former situation may arise, indeed in one notable instance has done so. But that instance hardly can be taken to be a normal or usual case. Unions too most often operate under the electoral process and the principle of majority rule. Nor in the latter situation does it seem reasonable to presume dissent from mere absence of explicit assent, especially in view of long-established union practice.
If merely "minority or dissenter protection" were intended, it would be sufficient for securing this to permit the dissenting members to carry the burden of making known their position and to relieve them of any duty to pay dues or portions of them to be applied to the forbidden uses without jeopardy to their rights as members. This would be clearly sufficient, it would seem, to protect dissenting members against use of funds contributed by them for purposes they disapprove, but would not deprive the union of the right to use the funds of concurring members, more often than otherwise a majority, without securing their express consent in advance of the use.[26]
*150 Again, in view of these facts, the section is more broadly drawn than is necessary to reach the intended evil. Moreover, this demonstrates, in my opinion, that "minority protection" was not the only or perhaps the dominant object of its enactment. That object was rather to force unions as such entirely out of political life and activity, including for presently pertinent purposes the expression of organized viewpoint concerning matters affecting their vital interests at the most crucial point where the expression would become effective. Cf. Thomas v. Collins, supra at 536-537; Board of Education v. Barnette, 319 U.S. 624, 642; Bridges v. California, 314 U.S. 252, 269. And so we come back to the conjunction of objectives which, taken together, are claimed to sustain the section's validity.
It would be a very great infringement of individual as well as group freedoms, affecting vast numbers of our citizens, if labor unions could be deprived of all right of expression upon pending political matters affecting their interests. But we need not now decide whether § 313 has gone so far.[27]
For if we assume that the objects said to have been the motivation for enacting § 313 can sustain substantial limitations upon the rights of free expression and assembly, *151 they cannot support the sweeping and highly indefinite restrictions placed upon them, whether by the section as drawn, as legislatively construed, or as sought to be applied. It is difficult to conceive a statute affecting those rights more lacking in precision, more broad in the scope of doubt and uncertainty of its reach.
We have only the broad and indefinite words "expenditure in connection with any election." Apart from the literal sweep of "expenditure" and the large area of doubt created by efforts to confine it, what is "in connection with"?[28] What is a forbidden because a political comment?[29] What sorts of union activities outside of publishing a newspaper with unsegregated funds would fall under the ban?[30]
*152 The catalogue of doubt and uncertainty need not be extended. Throughout the preceding discussion, both of coverage and of validity, instances have been noted which demonstrate its encyclopedic scope. The case is not one where a hard core of certain prohibition has been formed, with only a fringe of doubt narrow in scope at its outer boundary. Indeed the difference between the view now *153 taken by the Court and that taken by the Senate and presumably by the House shows that even the core is soft. To the gambles of the statute itself are added those of guessing not only at its perimeter but at its very center. Nor have these been lessened by today's decision other than by eliminating the one application the legislative discussion had sought to make clear.
Vagueness and uncertainty so vast and all-pervasive seeking to restrict or delimit First Amendment freedoms are wholly at war with the long-established constitutional principles surrounding their delimitation. They measure up neither to the requirement of narrow drafting to meet the precise evil sought to be curbed nor to the one that conduct proscribed must be defined with sufficient specificity not to blanket large areas of unforbidden conduct with doubt and uncertainty of coverage. In this respect the Amendment's policy adds its own force to that of due process in the definition of crime to forbid such consequences. Cf. Winters v. New York, supra. If the statute outlaws all union expenditures for expression of political views, it is a bludgeon ill-designed for curbing the evils said to justify its enactment, without also curbing the rights. If the section does less, the exact thing forbidden is too loosely defined and the consequent cloud cast over the things not proscribed but within the Amendment's bearing is far too great. In this aspect and in view of the criminal sanctions imposed, the section serves as a prior restraint upon the freedoms of expression and of assembly the Amendment was designed to secure. Only a master, if any, could walk the perilous wire strung by the section's criteria.
The force of these considerations is vastly multiplied when it is recalled that, unless they were effective to nullify the section in its application to publicizing activities, the broadly prohibitive and blanketing consequences *154 would be applicable also to all similar corporate political expressions, possibly not excepting even those of the regularly conducted corporate press.[31] This would be true, for instance, if the Senate sponsor's contrary view should meet the same fate in this Court that his view of the section's application to the presently involved situation has met. Moreover, in the sponsor's view special editions and apparently free distribution by such corporate publishers, containing political items, would appear to fall under the ban.
The argument for applying and sustaining the section in its presently attempted application has gone largely upon the assumption that it would be valid as applied to similar corporate publications, excepting possibly the regular press. The assumption is one not justified by any decision of this Court, which has the final voice in such matters. There are of course important legal and economic differences remaining between corporations and unincorporated associations, including labor unions, which justify large distinctions between them in legal treatment. But to whatever extent this may be true, it does not follow that the broadside and blanketing prohibitions here attempted in restriction of freedom of expression and assembly would be valid in their corporate applications. Corporations *155 have been held within the First Amendment's protection against restrictions upon the circulation of their media of expression. Grosjean v. American Press Co., 297 U.S. 233. It cannot therefore be taken, merely upon legislative assumption, practice or judgment, that restrictions upon freedoms of expression by corporations are valid. Again, those matters cannot be settled finally until this Court has spoken.
Finally, if § 313 is taken in the Court's construction, in my opinion its constitutionality stands in no better case. For I know of nothing in the Amendment's policy or history which turns or permits turning the applicability of its protections upon the difference between regular and merely casual or occasional distributions. Indeed pamphleteering was a common mode of exercising freedom of the press before and at the time of the Amendment's adoption. It cannot have been intended to tolerate exclusion of this form of exercising that freedom. Nor does making the difference between distribution to dues-paying members only and distribution to outsiders or the public, whether with or without price, make a constitutional difference. The Amendment did not make its protections turn on whether the hearer or reader pays, or can pay, for the publication or the privilege of hearing the oral or written pronouncement. Neither freedom of speech and the press nor the right of peaceable assembly is restricted to persons who can and do pay.
A statute which, in the claimed interest of free and honest elections, curtails the very freedoms that make possible exercise of the franchise by an informed and thinking electorate, and does this by indiscriminate blanketing of every expenditure made in connection with an election, serving as a prior restraint upon expression not in fact forbidden as well as upon what is, cannot be squared with the First Amendment.

*156 APPENDIX.
"Mr. PEPPER. . . .
"I wish to ask the Senator, if I may, this question: Would the newspaper called Labor, which is published by the Railway Labor Executives, be permitted to put out a special edition of the paper, for example, in support of President Truman, if he should be the Democratic candidate for the Presidency next year, and in opposition to the Senator from Ohio, if he should be the Republican nominee for the Presidency, stating that President Truman was a friend of labor and that the Senator from Ohio was not friendly to labor? Would that be called a political expenditure on the part of the labor organization?
"Mr. TAFT. If it were supported by union funds contributed by union members as union dues it would be a violation of the law, yes. It is exactly as if a railroad itself, using its stockholders' funds, published such an advertisement in the newspaper supporting one candidate as against another. If the paper called Labor is operated independently, if it derives its money from its subscribers, then of course there would be no violation. The prohibition is against a labor organization using its funds either as a contribution to a political campaign or as a direct expenditure of funds on its own behalf." (93 Cong. Rec. 6436.)

.....
"Mr. PEPPER. . . . Yet the Senator from Ohio says that the newspaper Labor, published by the 21 railway labor executives, would not be permitted to publish a statement saying that it supported President Truman and opposed Candidate Taft, or vice versa. I say that would be a deprivation of the freedom of the press.
"Mr. TAFT. No; I said that union funds could not be used for that purpose. They could conduct a newspaper *157 if they wanted to, just as a corporation can conduct a newspaper. But why should a labor organization be able to publish pamphlets or special newspapers against one candidate or in favor of another candidate, using funds which that organization collected from the union members?" (Id. 6436-6437.)

.....
"Mr. PEPPER, Mr. President, I call the attention of the Senator from Ohio to the following practice of the railway labor executives in the past: If a certain candidate was unfriendly to the interests of labor, they would publish a special edition of their paper and would put that special edition into circulation in the area where that candidate was running for office, and would place it in the hands of labor-union members and also in the hands of the public generally.
"Mr. TAFT. That is exactly what they should not be allowed to do.
"Mr. PEPPER. Very well; I want it definitely understood that the Senator from Ohio intends to outlaw that privilege on the part of labor. Now that I have that clear 
"Mr. TAFT. It is perfectly clear. It is perfectly clear that union funds are not to be used to interfere in political campaigns and with political candidates, either in favor of one candidate or against another candidate. . . ." (Id. 6437.)

.....
"Mr. BARKLEY. So if there is a labor organization which is publishing a newspaper  not as a political newspaper, but for the benefit of its members  and if the expenses of that publication and distribution are paid from the funds raised by means of the payment of dues, and if all members of the union understand that a certain portion of their dues goes to the publication of that newspaper, *158 then in order for that newspaper to take any position with respect to any candidate, it would have to charge a subscription by the month or by the year, in order that it might express its views in that respect; is that so?
"Mr. TAFT. I am inclined to think so, just as a corporation gets out regular house organs to its members, and if that corporation interferes in a political election through one of those house organs it violates the Corrupt Practices Act. . . ." (Id. 6437-6438.)

.....
"Mr. MAGNUSON. In order to determine the meaning of that, let us assume a concrete example. The International Brotherhood of Teamsters have a newspaper, which they have published for many years. It has a circulation of probably 200,000. It is distributed to members. On the newsstand, no price appears on it. No advertisements are accepted. Under this prohibition, would they be prohibited in the future from mentioning in their editorial columns, for their regular circulation, without adding anything additional, the support of a certain candidate or a certain political party?
"Mr. TAFT. We discussed that. We discussed the question of whether or not that newspaper was supported in effect by contributions of corporations or labor organizations, or was paid for by the people who received it. If the latter, I do not think it was an expenditure of union funds or contributions, but if the union simply takes the union funds and publishes a newspaper and uses it as a political organ in an effort to elect or to defeat one man that is prohibited." (Id. 6439-6440.)

.....
"Mr. MAGNUSON. . . . If the pending bill should become law it would mean that all labor organs which are *159 now in existence would, from now on, be prohibited from participating in a campaign, favoring a candidate, mentioning his name, or endorsing him for public office?
"Mr. TAFT. No; I do not think it means that. The union can issue a newspaper, and can charge the members for the newspaper, that is, the members who buy copies of the newspaper, and the union can put such matters in the newspaper if it wants to. The union can separate the payment of dues from the payment for a newspaper if its members are willing to do so, that is, if the members are willing to subscribe to that kind of a newspaper. I presume the members would be willing to do so. A union can publish such a newspaper, or unions can do as was done last year, organize something like the PAC, a political organization, and receive direct contributions, just so long as members of the union know what they are contributing to, and the dues which they pay into the union treasury are not used for such purpose." (Id. 6440.)
NOTES
[1] § 304, Labor Management Relations Act, 1947, 61 Stat. 159, enacted June 23, 1947:

"`SEC. 313. It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section. Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned for not more than one year, or both. For the purposes of this section "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.'"
The additions of 1947 are italicized.
[2] Thornhill v. Alabama, 310 U.S. 88; West Virginia State Board of Education v. Barnette, 319 U.S. 624, and Thomas v. Collins, 323 U.S. 516, were cited.
[3] "(3) That at all the times hereinafter mentioned, the said defendant CIO owned, composed, edited, and published a weekly periodical known as `The CIO News', and the said defendant CIO paid all of the costs and made all of the expenditures necessary and incidental to the publication and distribution of said periodical, `The CIO News', from the funds of the said defendant CIO, including the salaries of the editors and contributors and other writers of texts set forth in said periodical including also the cost of the printing of the said periodical and the cost of the distribution of the said periodical, and all such payments and expenditures, including those representing the cost and distribution of the issue of said `The CIO News' under date of July 14, 1947, and designated as Volume 10, No. 28, were made by said defendant CIO at Washington, in the District of Columbia, and within the jurisdiction of this Court."

(6) "(b) That the defendant CIO also caused one thousand copies of the issue of the publication, `The CIO News', dated July 14, 1947, and designated as the issue known as Volume 10, No. 28, to be specially moved and transported from Washington, District of Columbia, into the Third Congressional District of the State of Maryland, by mailing the said one thousand extra copies to the Regional CIO Director at Baltimore, Maryland, and caused the funds of the said defendant CIO to be expended in printing, packaging and transportation of said extra copies of the periodical, `The CIO News', in connection with the aforesaid special election."
[4] The direction was in this form: "I therefore have directed and requested the editor of the CIO News to publish this statement, including the following paragraphs, and to give to this issue of the CIO News proper circulation among the members of CIO unions in the City of Baltimore and, particularly, within the Congressional District in which this election is scheduled to take place."
[5] United States v. Kirby, 7 Wall. 482, 486-87; Hawaii v. Mankichi, 190 U.S. 197, 211; Fort Smith & Western R. Co. v. Mills, 253 U.S. 206, 209; United States v. Katz, 271 U.S. 354, 359; United States v. Guaranty Trust Co., 280 U.S. 478, 485; Keifer & Keifer v. R.F.C., 306 U.S. 381, 391, n. 4; United States v. American Trucking Assns., 310 U.S. 534, 544.
[6] Burnet v. Harmel, 287 U.S. 103, 108; Boston Sand Co. v. United States, 278 U.S. 41.
[7] Harrison v. Northern Trust Co., 317 U.S. 476, 479.
[8] See 40 Cong. Rec. 96; 41 Cong. Rec. 22.
[9] See Hearings before the House Committee on the Election of the President, 59th Cong., 1st Sess. 76 (1906); 40 Cong. Rec. 96.

In 1909 the Criminal Code of the United States, which codified, revised and amended the penal laws of the country, was passed. 35 Stat. 1088. The Act of 1907 was reenacted as § 83. 35 Stat. 1103.
[10] 36 Stat. 822, as amended by 37 Stat. 25.
[11] 43 Stat. 1074. "Contribution" was defined to include "a gift, subscription, loan, advance, or deposit, of money, or anything of value, and includes a contract, promise, or agreement, whether or not legally enforceable, to make a contribution." 43 Stat. 1071.
[12] 43 Stat. 1070.
[13] 57 Stat. 167. "It is unlawful for any . . . labor organization to make a contribution in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section."
[14] 57 Stat. 168. "Except as to offenses committed prior to such date, the provisions of this Act and the amendments made by this Act shall cease to be effective at the end of six months following the termination of hostilities in the present war, as proclaimed by the President, or upon the date (prior to the date of such proclamation) of the passage of a concurrent resolution of the two Houses of Congress stating that such provisions and amendments shall cease to be effective."
[15] See Hearings before a Subcommittee of the Committee on Labor on H.R. 804, and H.R. 1483, 78th Cong., 1st Sess. 2, 4; S. Rep. No. 101, 79th Cong., 1st Sess. 24.
[16] See Hearings on H.R. 804 and H.R. 1483, supra, n. 15, 117-18, 133; 89 Cong. Rec. 5334, 5792; 93 Cong. Rec. 6440.
[17] See H.R. Rep. No. 2093, 78th Cong., 2d Sess. 11; S. Rep. No. 101, supra, n. 15, 57-59; H.R. Rep. No. 2739, 79th Cong., 2d Sess. 39-40; S. Rep. No. 1, Part 2, 80th Cong., 1st Sess. 37, 38-39.
[18] See note 17, supra.
[19] This point was repeatedly emphasized in the Senate debates. See 93 Cong. Rec. 6436-39.
[20] United States v. Delaware & Hudson Co., 213 U.S. 366, 407-408:

"It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity. Knights Templars Indemnity Co. v. Jarman, 187 U.S. 197, 205. And unless this rule be considered as meaning that our duty is to first decide that a statute is unconstitutional and then proceed to hold that such ruling was unnecessary because the statute is susceptible of a meaning, which causes it not to be repugnant to the Constitution, the rule plainly must mean that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter. Harriman v. Interstate Com. Comm., 211 U.S. 407."
Federal Trade Comm'n v. American Tobacco Co., 264 U.S. 298, 307; Missouri P.R. Co. v. Boone, 270 U.S. 466, 471-72; cf. Blodgett v. Holden, 275 U.S. 142, 147.
[21] Compare "Free discussion of the problems of society is a cardinal principle of Americanism  a principle which all are zealous to preserve." Pennekamp v. Florida, 328 U.S. 331, 346.

"The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment." Thomas v. Collins, 323 U.S. 516, 529-30.
"For the First Amendment does not speak equivocally. It prohibits any law `abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." Bridges v. California, 314 U.S. 252, 263.
[22] 93 Cong. Rec. 6436, 6437, 6439.
[23] See 93 Cong. Rec. 6437-40.
[1] See 1 Farrand, The Records of the Federal Convention of 1787 (1911) 21, 28, 94, 97 et seq., 105, 107, 109, 110, 111 et seq., 131, 138, 141, 144-45; 2 id. 71, 73 et seq., 294-95, 298 et seq.
[2] 1. "The government concedes that rights guaranteed by the First Amendment are abridged by the prohibition against expenditures by labor organizations in connection with elections; but it says that Congress has power under Article I, Section 4, of the Constitution to abridge First Amendment rights if it considers such a course necessary in maintaining the purity and freedom of elections."

"Thus the Court is confronted with the necessity of passing on the validity of Section 304 of the Act, insofar as it relates to expenditures by labor organizations in connection with federal elections."
2. "It is insisted by the government that Congress could abridge the freedoms guaranteed by the First Amendment (which the government concedes was done here) because of its constitutional control over the manner of holding elections, and its consequent power to prevent corruption therein, and to secure clean elections."
3. "In support of its argument that congressional control over elections may be exercised in abridgment of rights protected by the First Amendment, the government points to the case of United Public Workers v. Mitchell, 330 U.S. 75."
[1] Section 313 of the Corrupt Practices Act, as amended by § 304 of the Labor Management Relations Act of 1947, 61 Stat. 159.
[2] Rescue Army v. Municipal Court, 331 U.S. 549; Ashwander v. Valley Authority, 297 U.S. 288, concurring opinion of Mr. Justice Brandeis at 346-348; Federation of Labor v. McAdory, 325 U.S. 450; United Public Workers v. Mitchell, 330 U.S. 75.
[3] The statutory wording is: ". . . expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices. . . ."
[4] The indictment explicitly charges that "The CIO News" was regularly (weekly) published by the C.I.O. and costs of publication and distribution, including the issue in question, were paid from the union's funds. There was no allegation concerning their source, whether from revenues not connected with or earmarked for receipt of the paper or from sources specifically so connected. The Court's opinion does not, nor could it fairly, assume that the allegations were limited to expenditure of funds derived from subscriptions, advertising revenues or returns from per copy sales. The opinion explicitly holds that source of the funds is immaterial under § 313 for coverage of the type of publication and circulation here involved.
[5] By the opinion's phrase, "in regular course to those accustomed to receive copies," p. 123, ante (emphasis added), room seems to be left for the inference that insubstantial distribution outside the membership would not tend to bring the case within the section's terms.
[6] See note 3. The section as presently effective is quoted in full at note 1 of the Court's opinion.
[7] "Contribution" had been construed by legislative committees investigating campaign expenditures prior to 1947, see notes 9 and 10, though not always unanimously, not to cover expenditures made by labor unions in publishing their political views during campaigns or at other times. See H.R. Rep. No. 2093, 78th Cong., 2d Sess. 10-11; Sen. Rep. No. 101, 79th Cong., 1st Sess. 57-59, 83-84; H.R. Rep. No. 2739, 79th Cong., 2d Sess. 39-40, 46; Sen. Rep. No. 1, Part 2, 80th Cong., 1st Sess. 37, 38-39. It is not necessary to summarize the differing viewpoints expressed in the 1947 debates concerning the validity of this construction. Whether valid or not would make only the difference between extending the statute's scope by adding to its terms or by "plugging a loophole," albeit a large one, created by misconstruction. In either event a large addition to the section's coverage was made. See, e.g., 93 Cong. Rec. 6438-6440.

The Federal Corrupt Practices Act of 1925, 43 Stat. 1070, amended the preexisting legislation forbidding a corporate "money contribution" by changing that term to "contribution" and defining this to include "a gift, subscription, loan, advance, or deposit, of money, or anything of value, and includes a contract, promise, or agreement, whether or not legally enforceable, to make a contribution. . . ." Since "expenditure" was intended to broaden "contribution" in the 1947 amendment of § 313, it would seem that its scope could hardly be less broad than was given by the 1925 Act's definition to "contribution," although the Government does not appear to urge that "expenditure" incorporates that definition.
[8] See 93 Cong. Rec. 6436-6441, 6446-6448, and excerpts quoted in the Court's opinion and the appendix to this one. Cf. also notes 11, 12, 13.
[9] These were the objects of the prohibition against "contributions" by labor unions, which first appeared on a temporary basis in 1943 in the War Labor Disputes Act, which by its terms was to expire six months following the termination of hostilities. Act of June 25, 1943, c. 144, § 9, 57 Stat. 167. See Hearings before a Subcommittee of the Committee on Labor on H.R. 804 and H.R. 1483, 78th Cong., 1st Sess. 2, 4, 117, 118, 133. Cf. 89 Cong. Rec. 5328, 5334, 5792. The Government's brief states that the legislative history of the 1943 Act shows that the principal basis of the extension to labor unions, like that of the same and earlier acts applying to corporations, "was the securing of elections in accordance with the will of the people through removing disproportionate influences exerted by means of large aggregations of money."

Since the 1947 amendment to § 313 was designed to make permanent the prohibitions of the 1943 Act, H.R. Rep. No. 245, 80th Cong., 1st Sess. 46; H.R. Rep. No. 510, 80th Cong., 1st Sess. 67-68 (Conference report to accompany H.R. 3020), and to expand them by adding "expenditures," the objects of the 1943 Act necessarily were carried forward into the 1947 amendment. Ibid. See also 93 Cong. Rec. 3428.
[10] Congressional committees investigating campaign expenditures in 1946 and 1947 had recommended that "expenditures" be added to the prohibition of § 313. See H.R. Rep. No. 2739, 79th Cong., 2d Sess. 39-40, 46; Sen. Rep. No. 1, Part 2, 80th Cong., 1st Sess. 37, 38-39. The so-called Taft-Hartley Bill as introduced in the House contained the prohibition, H.R. 3020, 80th Cong., 1st Sess., § 304, while the Senate version did not. S. 1126, 80th Cong., 1st Sess. There was apparently little discussion in either body on the matter until the conference report incorporating the provision was made. H.R. Rep. No. 510, 80th Cong., 1st Sess. Then lengthy discussion ensued in the Senate, from which excerpts are quoted in the Court's opinion and in the appendix to this one. See 93 Cong. Rec. 6436-6441, 6445-6448, 6522-6524, 6530.
[11] Some of the more important instances included whether the section applies to forbid political comment or information "in connection with" elections by corporately owned newspapers and periodicals, in regular course of distribution, 93 Cong. Rec. 6436, or in special editions, ibid.; by "house organs," id. 6440, or like publications put out by corporations engaging primarily in other business than publishing; by religious, ibid., and charitable corporations; by organizations like the Anti-Saloon League, ibid.; by radio commentators sponsored by commercial corporations, id. 6439, 6447; by trade associations, such as the National Association of Manufacturers, which receive funds from constituent corporations, id. 6438.

These inquiries generally proceeded with analogous ones relating to comparable activities of unions and comparable responses, touching for example P.A.C. activities; labor publications, regular or special; sponsored broadcasts, etc. Illustrative responses are set forth in note 12.
[12] E.g., the regular corporately owned press was considered not covered as to its ordinary circulation, because "that is the operation of the newspaper itself," 93 Cong. Rec. 6437. The same exemption from coverage, however, was thought not to extend to regularly published union or labor papers, since members' dues could not be so used without specific earmarking or designation by each for such use, even though from previous practice they might know such use would be made. Id. 6440. On the other hand, neither the regular press, corporately owned, nor union papers could publish special editions or distribute them with or without charge. Nor could house organs, union or corporate, comment politically, or religious organizations, if incorporated; neither could associations like the National Association of Manufacturers, which receive funds from corporations and by such expenditures would be making "contributions" indirectly. Problems involving organizations like the Anti-Saloon League and sponsored radio broadcasts, whether by unions or corporations, as well as guest appearances of candidates and others supporting them on sponsored radio programs, raised matters of greater difficulty. See the various pertinent citations in note 11. Cf. notes 13 and 14.
[13] The problems raised in connection with radio discussions presented particularly dubious situations, frequently admitted to call for further facts, to present questions of fact, and to require fine lines of distinction. See, e.g., 93 Cong. Rec. 6439, 6440.

Difficulty arose and doubt was expressed also over what would constitute political comment, e.g., publishing an incumbent candidate's voting record, id. 6438, 6446, 6447, an instance in which the Senate sponsor at first disagreed with Senator Ball, but later apparently though somewhat equivocally agreed with him that publication of the record without comment further than "merely a bare statement of actual facts and simply direct quotations of what the man had said in the course of certain speeches on certain subjects" would not be forbidden, id. 6447; corporate broadcasts not for or against a candidate, but for a party or relating to issues in the election, said to be "again, a question of fact" and to depend on "how close it is to the election." Ibid. These instances are illustrative only, not comprehensive. Cf. note 29.
[14] This rubric turned the answers to the inquiries and situations mentioned in notes 11, 12 and 13, as indeed to all others. If the funds used for the publication came to the corporate or union treasury without securing the contributor's express consent for that use, the organization could not so apply them; if so contributed, they could be thus employed. Except in the case of the regular corporate press which presumably was not covered as to ordinary circulation, cf. note 12 supra, expenditure of any corporate or union funds not derived from operation of the publication, e.g., from advertising revenues or returns from per copy sales, or funds received from individuals without individual and explicit authorization for the purpose of the publication was forbidden.
[15] See the appendix to this opinion, post, p. 156.
[16] Since the statute in my judgment abridges those freedoms here, it is unnecessary to consider other groundings urged for its invalidation.
[17] Thomas v. Collins, 323 U.S. 516, 531; Board of Education v. Barnette, 319 U.S. 624, 639; Thornhill v. Alabama, 310 U.S. 88, 96; Schneider v. State, 308 U.S. 147, 161.
[18] Thomas v. Collins, 323 U.S. 516, 530; Thornhill v. Alabama, 310 U.S. 88, 95; Schneider v. State, 308 U.S. 147, 161; cf. United States v. Carolene Products Co., 304 U.S. 144, 152, n. 4.
[19] Thomas v. Collins, 323 U.S. 516, 530; and cf. other cases cited in note 17.
[20] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

See also U.S. Const., Art. I, § 2, clause 1, § 8, clause 18. Cf. as to Congress' power over the electoral process, Ex parte Yarbrough, 110 U.S. 651; United States v. Classic, 313 U.S. 299.
[21] As has been noted, the Senate debate went largely on the "minority protection" basis of justification with only inferential or incidental reference to corrupting influence and occasional suggestions of "undue influence." See, however, the statements of Representative Hoffman, 93 Cong. Rec. 3428, and of Senator Taft, id. 6437.
[22] The brief, however, includes among the reasons for the prohibition of § 313 "A distrust of the use of large contributions, not because these prove corruption, but because the large single contributions imply resulting obligations and, therefore, can breed corruption"; and goes on to state that "there is no practical difference between a contribution and an expenditure so far as the effect of the use of money for campaign purposes is concerned."
[23] Apparently the Senate sponsor considered that revenues derived from the operation of union newspapers, such as advertising revenues, etc., are available for political publicity, although they are union funds in which politically dissentient members have interests proportionally with concurring ones and, it seems, do not give explicit consent to such use. The situation, like the case of the regular incorporated press, would seem to be exceptional in permitting the union (or corporation) to use its own funds for political publicity.
[24] See note 12 supra.
[25] It would even seem questionable whether union funds, not individually earmarked for the purpose, could be used for calling union meetings to discuss and determine official political policies or to hear candidates or others expressing their views on campaign issues. Cf. note 30 infra.
[26] This difference is minimized, though noted, in the Government's comparison of § 313 with the British legislation and experience. Cf. Trade Union Act of 1913, 2 & 3 Geo. V, c. 30; Trade Disputes and Trade Unions Act of 1927, 17 & 18 Geo. V, c. 22, repealed by Trade Disputes and Trade Unions Act of 1946, 9 & 10 Geo. VI, c. 52. The legislation was not intended to prevent expenditures for union newspapers. See Rothschild, Government Regulation of Trade Unions in Great Britain: II, 38 Col. L. Rev. 1335, 1364. And see further regarding the British legislation's effect, DeMille v. American Federation of Radio Artists, 31 Cal.2d 137, 148, distinguishing Amalgamated Society of Railway Servants v. Osborne, [1910] A.C. 87.
[27] Cf.: "It is perfectly clear that union funds are not to be used to interfere in political campaigns and with political candidates, either in favor of one candidate or against another candidate." 93 Cong. Rec. 6437. "Labor unions are supposed to keep out of politics in the same way that corporations are supposed to keep out of politics." Id. 6440.
[28] When does the connection begin? Obviously not with the date of the election, primary, convention or caucus. How long beforehand, with the announcement of candidacies or with earlier though not always public efforts to induce persons to run? When does the connection end? With the selection of candidates in the one case and the election of officers in the other or does it extend to activities relating to these events taking place later?
[29] The publication of bare facts, e.g., voting records, of quotations from speeches and addresses, their reproduction in full? Cf. note 13. And does accuracy or inaccuracy of the quotation make the difference between criminality and legality? Could a president's speech in the course of a campaign for reelection be reproduced in a union newspaper published with unsegregated funds, whether designedly and clearly political or purporting not to be so? Where to draw the line between facts and comment, or comment and advocacy or opposition?
[30] A summary from appellees' brief indicates the scope and variety of questions which would arise:

"This measure thus on its face would prevent a labor organization from holding a meeting for the purpose of advocating the election or defeat of a particular political candidate. It would preclude a labor organization from organizing a public gathering to advocate the election of a candidate pledged to the defeat of such a measure as Section 304. [§ 313 as amended.]
"A labor organization under this statute could not place at the disposal of a candidate its own hall. It could not engage radio time to denounce a candidate who had identified himself with interests fundamentally opposed to those basic to the interests of the defendants. Nor could it pay the salary or expenses of an individual for the purpose of permitting him to participate in a political campaign.
"Handbills, placards or union newspapers advising the union membership of the voting records of public officials could not be published or distributed at election time to advocate either the election of labor's friends or the defeat of labor's enemies. Paid advertisements and radio publications for the same purposes would be likewise proscribed.
"No matter how dangerous the threat presented by a candidate to the fundamental interests of a labor organization, it is powerless under this law to speak and to inform the people of its views. It could not send to a single member a penny postcard dealing with such a candidate. It could not even send a delegate or observer to a political convention.
"It could oppose bad laws but not `in connection with any election'. It could endorse good laws but at all times both its opposition and its endorsement would be undertaken at the peril of crossing the line at which such opposition or endorsement or advocacy could be regarded as being `in connection with any election'.
"Moreover, a labor organization could not sponsor a public meeting in connection with an election for the purpose of hearing the views of candidates of various political parties with respect to issues of importance to its membership since such a meeting would inevitably require expenditures.
"The traditional campaigns on the part of labor organizations prior to federal elections to `get out the vote' would, since they require expenditures, be proscribed by the statute. And the publication of voting guides and analyses of the voting records of candidates would likewise be condemned."
[31] Cf. the President's view, stated in his veto message as follows:

"Furthermore, this provision can be interpreted as going far beyond its apparent objectives, and as interfering with necessary business activities. It provides no exemption for corporations whose business is the publication of newspapers or the operation of radio stations. It makes no distinctions between expenditures made by such corporations for the purpose of influencing the results of an election, and other expenditures made by them in the normal course of their business `in connection with' an election. Thus it would raise a host of troublesome questions concerning the legality of many practices ordinarily engaged in by newspapers and radio stations." H.R. Doc. No. 334, 80th Cong., 1st Sess. 9-10.