In the Matter of HENRY PAYSON et al., Appellants, against JOSEPH J. CAPUTA, as State Rent Administrator, Respondent, and VARIOUS TENANTS OF 2 SUTTON PLACE SOUTH, Intervenors-Respondents.

First Department, November 17, 1959.

*Lewis M. Isaacs, Jr.,* of counsel (*R. E. Burdick* with him on the brief; *M. S. & I. S. Isaacs,* attorneys), for appellants.

*Harold Zucker* for respondent.

*William L. Messing* for intervenors-respondents.

*Robert S. Fougner* of counsel (*McLaughlin & Fougner,* attorneys), *amicus curiæ.*

BREITEL, J. Petitioners, owners of a multiple dwelling subject to the State Residential Rent Law, seek a rent increase on the ground that the property does not return at least 6% annually on its valuation. They ground their application on the purchase price on a prior sale of the property which they assert provides the proper valuation base within the purview of the statute and the regulations. The sale in question, while in form to an individual buyer, was, in effect, a sale to a syndicate which the buyer represented. It is undisputed that the syndicate, in making the purchase, contemplated, among a number of alternatives, the conversion of the property into a multiple dwelling "luxury" co-operative.

The Rent Administrator rejected the purchase price on the prior sale on the ground that the statute precluded its use,

because the sale was one to a co-operative. In the article 78 proceeding brought by the present and immediately preceding owners of the property Special Term upheld the action of the Administrator and dismissed the petition.

It is concluded that the summary exclusion of the prior sale was unauthorized. As a consequence, the order of Special Term sustaining the determination of the Rent Administrator should be reversed and the proceedings remanded to the Rent Administrator for appropriate action.

The statute authorizes rent increases when the annual return from the property is less than 6% on the assessed valuation or, in lieu of such assessed valuation, the sale price "where there has been a bona fide sale of the property within the period between March fifteenth, nineteen hundred fifty-three, and the time of the filing of the application". To satisfy the statutory standard it is further provided that the sale must be: 1) a result of a transaction at arm's length; 2) on normal financing terms; 3) at a readily ascertainable price; and 4) that the price is "unaffected by special circumstances such as a forced sale, exchange of property, package deal, wash sale or sale to cooperative". (State Residential Rent Law, § 4, subd. 4, par. [a], cl. [1]; L. 1946, ch. 274, as last amd. by L. 1959, ch. 695.)*

The Rent Administrator has taken a position which rests on two points, namely that the transaction in question was a sale to a co-operative and that with respect to a sale to a co-operative it is without discretion whether it will accept or reject such a sale price as a base for computing annual return. Petitioners, on the other hand, contend that there was no sale to a co-operative within any meaning of the whole phrase or of the particular term "cooperative" and that, in any event, whether there is a sale to a co-operative or not, for the purpose of determining annual return, the Administrator is required to look to whether the actual sale price was "affected" by such special circumstances.

The facts are simple.

---

* The statute in pertinent part reads as follows:

\* \* \*

" (1) the rental income from a property yields a net annual return of less than six per centum of the valuation of the property. Such valuation shall be the current assessed valuation \* \* \* except where there has been a bona fide sale of the property within the period between March fifteenth, nineteen hundred fifty-three, and the time of filing of the application, as the result of a transaction at arms' [sic] length, on normal financing terms at a readily ascertainable price and unaffected by special circumstances such as a forced sale, exchange of property, package deal, wash sale or sale to cooperative ".

One Henry Payson, on behalf of himself and a syndicate, after a public offering by the then owners, negotiated the purchase of the multiple dwelling at 2 Sutton Place South, a "luxury" apartment house in Manhattan. He took title in his own name and paid a price of $2.8 million. He was one of several bidders. A competing responsible bidder had offered $2.6 million and another equally responsible bidder had offered $2.75 million. The assessed valuation of the property was $1.75 million. The property was earning 6% on the assessed valuation, and therefore the return would be correspondingly less if based on the purchase price.

No sooner had the contract for the purchase of the property been signed than the individual buyer caused to be organized the corporation which bears the name 2 Sutton Place South Tenants' Corp. It was organized under the Stock Corporation Law. The plan was, concededly, to project the new corporation as a tenants' co-operative to take title to the building and to sell proprietary leases and stock in the corporation to tenants in occupancy and to outsiders where the occupant tenants did not purchase. Mr. Payson has said at all times that when the property was purchased it was contemplated that a profit would be made from the transaction, and that it was hoped that this would be accomplished by converting the property into a co-operative. Matters did not run, however, as smoothly as had been planned and the new corporation failed to obtain, as purchasers of stock and proprietary leases, more than a small proportion of the tenants. In consequence, the offer by the buyer to resell the property to the new corporation for $3.3 million was withdrawn.

As a further consequence, the plan never became an eligible co-operative plan within the provisions of section 55 of the State Rent and Eviction Regulations promulgated by the Temporary State Housing Rent Commission. These provisions variously require that certain portions of the housing accommodations in the premises must be held by individual tenant owners before certificates of eviction may be issued with respect to apartments not held by tenant owners. Had the co-operative plan matured, the buyer proposed, as already observed, to resell the property to the "cooperative corporation" for $3.3 million. Instead, he transferred title to the property to the corporation in exchange for its stock, and he and it made the instant application for a rent increase on the ground that the property did not earn 6% of the valuation of

the property.* For this purpose it asserted that the prior sale price to Mr. Payson, or the syndicate, in the amount of $2.8 million, was a bona fide sale price, satisfying all the requirements of the statute and the regulations promulgated pursuant to the statute.

There is no serious dispute that the prior sale was the result of competitive bidding following a public offering in an open market in which neither the seller nor the buyer was impelled by any special circumstances to consummate the transaction with each other, as distinguished from any effect the plan to create a co-operative had on the amount of the price paid. Moreover, the margin among the several competitive bids was close enough ($50,000 and $100,000 respectively) to bespeak a transaction at arm's length. No issue is raised as to the financing terms being of such a character as to affect abnormally the price that was paid. There was no forced sale, there was no exchange of property, and there was no package deal or wash sale. And, of course, there is a readily ascertainable price — $2.8 million. But the Rent Administrator and the tenants take the view that the fact that the purchase was made with the intention of converting the property into a co-operative made the sale to the purchaser one to a co-operative.

Of course, concededly, neither the buyer nor the syndicate which he represented was a co-operative, but it is argued that the nominal buyer was no more than a conduit for a co-operative that was to be, and was, created as soon as the contract of sale was closed. Under the circumstances, it is urged, the price offered and paid by the nominal buyer was "affected" by the opportunities for profit represented by conversion to a co-operative and, therefore, comes within the proscription of the statute.

To consider the view thus urged, it is necessary to analyze the term and nature of a co-operative within the meaning of the statute. The word "cooperative", although of ancient usage and well known to the law, has a variable meaning which is quite flexible, depending upon the context in which it is used (18 C. J. S., Co-operative, p. 127; Cooperative Corporations Law, § 3, subd. [c]; General Corporation Law, § 3, subd. 10;

---

* The statute looks to the return from the "property" and it is immaterial how the status of owner is derived (cf. *Matter of Ackerman* v. *Weaver*, 6 N Y 2d 283, revg. 7 A D 2d 97). Moreover, as a practical matter, although any rent increase would be allocated to all the units in the premises, only nonowner tenants would be required to pay such increase. The owner tenants pay no rent but "maintenance" which is not a controlled rent.

although the use of the word " cooperative " in a corporate title is narrowly limited: Cooperative Corporations Law, § 3, subd. [j]; General Corporation Law, § 9; 1938 Atty. Gen. 283). In the field of residential rent control, as well as generally in the field of residential multiple dwellings, it has been singularized by a meaning all its own with qualified legislative acceptance (see *People ex rel. McGoldrick* v. *Sterling*, 283 App. Div. 88; *Gilligan* v. *Tishman Realty & Constr. Co.*, 283 App. Div. 157, affd. 306 N. Y. 974). The title-holding and stock-issuing corporation is not a co-operative within the meaning of the Cooperative Corporations Law. The tenant-owners, so called, receive stock in the corporation and proprietary leases for their respective apartments. For purposes of the regulations the title-holding corporation is treated as a co-operative only when various percentages of the tenant-owners have participated (State Rent and Eviction Regulations, § 55). The buyer could not qualify as such a corporation and neither could the corporation to which he transferred title, either at the inception or now. Literally speaking, then, there was no sale to a co-operative. The question, then, is advanced just a step further to see whether there was, nevertheless, virtually, even if not literally, a sale to a co-operative.

To carry the analysis further requires looking to the purpose of the statute. The kind of sale to a co-operative which results in an abnormal price, usually highly inflated as compared with market value, is one where the owner in possession sells to a proposed " cooperative " corporation which then consists, or will consist in the future, of tenant participants. There is but one possible buyer for the property, the proposed " cooperative " corporation. Thus, in the context of this case the proposed sale by the buyer Payson to the corporation, 2 Sutton Place South Tenants' Corp., at a price of $3.3 million was the transfer which is proscribed by the statute as a basis for determining the proper return on the property. The buyer Payson was in a position to fix that price or almost any other price he chose for that transfer (cf. *Judson* v. *Frankel*, 279 App. Div. 372).

But the situation is hardly the same when the individual buyer, or even if it had been the corporation which he caused to be organized, bid in the market to purchase the property from its then owners. In that transaction there were competitive bids because the negotiation was accomplished in the open market following a public offering. While any bidder is inevitably influenced in fixing the amount of his bid by the variety of prospects for profit which he may contemplate, he

nevertheless will pay no more than, as in his judgment, he must to obtain the property. Similarly, the bidding for any commodity, including real estate, although in that instance there is less fluidity, will be influenced by the highest economic use to which the property can be put. So long as the participants in the market are at all guided by their judgment and self-seeking motivation the bidding must reflect the apparent highest economic use of the property sought to be purchased, and, if conversion to a co-operative is the apparent highest economic use for the property, that prospect, too, must influence the amount of the bids.

It thus follows that because the buyer contemplated converting the property into a co-operative it did not mean that there was reason why he should pay more for it than he must. It would only explain why he might be willing to pay a higher price, but not more than he must — the true market price. This is quite different from the situation which obtains in the sale to the co-operative itself, where the price is fixed between those who live, or will live, in the property and those who control its ownership — where there is a close market with only one seller and but one possible buyer. The character of the transaction is then what it was described to be in cases such as *Judson* v. *Frankel* (279 App. Div. 372, *supra*) and *Gilligan* v. *Tishman Realty & Constr. Co.* (283 App. Div. 157, affd. 306 N. Y. 974, *supra*).

On this reasoning there was no sale to a co-operative within the meaning of the statute or the regulations adopted pursuant to the statute. But it is not necessary to conclude that this is inevitably the only meaning of the statute and the regulations adopted under it. Even if it is assumed that the term " cooperative " may have a broader meaning than the one last discussed, namely, that the sale to the individual buyer may be construed, on the " conduit " theory, as a sale to a co-operative, there must be a determination different from the one thus far reached by the Rent Administrator and Special Term.

Prior to 1957 it was generally the view that there was a broad discretion resting in the Rent Administrator in accepting and rejecting sale prices for purposes of determining the 6% annual return (see, e.g., *Matter of 340 East 57th St. Corp.* v. *Weaver,* 3 Misc 2d 356, affd. 2 A D 2d 678, affd. 2 N Y 2d 799; see 1957 Report of the Temporary State Commission to Study Rents and Rental Conditions, N. Y. Legis. Doc., 1957, No. 22, p. 23; 1957 Legis. Annual, p. 264). In 1957 legislation was adopted designed to require the Rent Administrator to accept bona fide sale prices unless he first made a finding that the sale

price was affected by special circumstances, some of which were expressly denominated (State Residential Rent Law, § 4, subd. 4, par. [a], cl. [1]; L. 1957, ch. 755).

Nevertheless, the statute, as amended in 1957, specifies the several factors which must be found present in order that a sale be treated as bona fide. It is only as to the last factor that there is doubt cast in this case. That is the one which requires that the price be "unaffected by special circumstances such as a forced sale, exchange of property, package deal, wash sale or sale to cooperative". The language and punctuation of the statute shows that the clause in question modifies the word "price" and not the word "sale".

The statute does not provide that the mere presence of special circumstances precludes use of a sale price, or at least such a reading is not unequivocally required. It does stipulate that the sale price be "unaffected" by the special circumstances. Of course, it is difficult to think of a forced sale, an exchange of property, a package deal, or a wash sale, in which the price would not be affected by such special circumstances so as to be utterly unreliable. Each one of these categories by very definition would seem to preclude the finding of a readily ascertainable and reasonable price in a fair market.

With regard to the sale to a co-operative the same might be true, but only if a "sale to cooperative" is construed narrowly in the manner first discussed above. If "sale to cooperative" means what the Rent Administrator contends — that is, has the broader meaning — then there most certainly will still be the further problem of determining whether the sale price had been affected by that special circumstance. This further inquiry the Rent Administrator declined to carry on, based upon his construction of the statute. But he cannot have it both ways. If a "sale to cooperative" includes a person like Mr. Payson, an outside buyer who plans to convert the property into a co-operative, then the Rent Administrator will have to determine whether the sale price was affected by that special circumstance. And in that context he will have to analyze all of the other circumstances to see whether the fairness of the price negotiated at arm's length was "affected" in any way proscribed by the statute. Then there can be no question that petitioners were entitled to have their application passed upon as if there were no automatic and inflexible preclusion of the sale price by which the individual buyer — not the corporate retransferee — obtained the property. Or, on the other hand, the "sale to cooperative" may be confined to the type of transaction in which there is only one possible buyer, such as the later retrans-

fer by the buyer to 2 Sutton Place South Tenants' Corp. In that event, of course, petitioners were entitled to have the prior sale price used as a base, unless it was affected by some other special circumstance.

So, it is, whether the Rent Administrator concludes to accept either the narrower or the broader construction of "sale to cooperative" as used in the statute, he must, in any event, reconsider the determination made. The court, in this case, is not required to choose for the Rent Administrator which of the two constructions should be adopted; because, whichever construction is adopted, the Rent Administrator's function has not been completely discharged. In the absence of clearly indicated legislative intention, the court would have accepted, for the reasons already given, the narrower construction; but in administrative matters the administrative agency's view of the statute under which it operates is entitled to great weight (1 N. Y. Jur., Administrative Law, §§ 88–92; McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 129; cf. *Matter of Mounting & Finishing Co.* v. *McGoldrick,* 294 N. Y. 104; *Red Hook Cold Storage Co.* v. *Department of Labor,* 295 N. Y. 1, 9).

Because the Rent Administrator processed this application upon a view which is held erroneous it is necessary that the proceeding be remanded to him so that he may make such further inquiry, if any, as he deems advisable and then adopt an appropriate finding with regard to the prior sale price, namely, whether, in the light of the analysis, it was affected by any special circumstance, either those expressly denominated in the statute or not. If the price was not affected by any such special circumstance, the Rent Administrator is bound to accept the sale price as a base for computing the annual return. Thus, if no further evidence is available to support a contrary view, or if no further factor establishing a special circumstance can be related to the prior sale in this case, then the Rent Administrator is bound to grant the application of petitioners.

Accordingly, the order of Special Term should be reversed, on the law and the facts, without costs to any party, and the determination of the Rent Administrator annulled and, in the exercise of discretion, the proceedings remanded for the purpose of reconsidering the application, taking such additional proof as he may be advised, and redetermining the application in accordance with the views expressed in this opinion.

Botein, P. J., Rabin, M. M. Frank and Bergan, JJ., concur.

Order unanimously reversed, on the law and on the facts, without costs to any party, and the determination of the Rent

Administrator annulled and, in the exercise of discretion, the proceedings remanded for the purpose of reconsidering the application, taking such additional proof as he may be advised, and redetermining the application in accordance with the views expressed in the opinion of BREITEL, J.