495 F.2d 844
 Donald E. SCHWARTZ, as the general guardian for Pamela B.
Schwartz, a minor, in a derivative capacity as a
shareholder of American Telephone and
Telegraph Company, Plaintiff-Appellee,
v.
H. I. ROMNES et al., Defendants-Appellants, Louis J.
Lefkowitz, Attorney General of the State of New
York, Intervenor-Appellant, and Yes for
Transportation in New York
State, Inc., Defendant.
 Nos. 125-127, Dockets 73-1680, 73-1696, 73-1713.
 United States Court of Appeals, Second Circuit.
 Argued Dec. 11, 1973.
Decided April 2, 1974.
 
 Lawrence E. Walsh, New York City (Philip C. Potter, Jr., Guy Miller Struve, Davis, Polk & Wardwell, New York City, of counsel), for individual appellants.
 Lippman Bodoff, New York City, for appellant American Telephone and Telegraph Co.
 George E. Ashley, New York City (Kenneth J. Lucey, New York City, of counsel), for N.Y. Telephone Co.
 Irving Galt, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of N.Y., Stanley Kantor, Deputy Asst. Atty. Gen., New York City, of counsel), for intervenor-appellant pro se.
 H. Miles Jaffe, New York City (Norwick, Raggio & Jaffe, New York City, of counsel), for appellee.
 Before KAUFMAN, Chief Judge, MANSFIELD and MULLIGAN, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 At issue on this appeal is whether the expenditure of $50,000 by the New York Telephone Company ('NYT') in 1971 for the purpose of publicizing views with respect to a proposed state public transportation bond issue to be submitted to the voters of New York for a referendum vote violated a New York statute (460, N.Y.Election Law, McKinney's Consol.Laws, c. 17[1] ) prohibiting corporate contributions for political purposes. If so, we are asked to decide whether the statute, as so construed, would deny NYT its First Amendment rights of free speech and petition. Since NYT and its parent, American Telephone and Telegraph Company ('AT&T'), are public utilities, we are also called upon to determine whether the $50,000 contribution was barred by a state statute (107, N.Y.Public Service Law, McKinney's Consol.Laws, c. 48[2] ) which prohibits public utilities, except with the consent of the state public service commission, from expending funds other than for certain specified purposes. In a derivative suit on behalf of NYT and AT&T against directors who approved the $50,000 expenditure plaintiff, an AT&T shareholder invoking diversity jurisdiction, sued to recover the $50,000 contribution on the ground that it violated the aforementioned state statutes. The district court granted summary judgment in plaintiff's favor. For reasons stated below, we reverse the grant of summary judgment and remand with instructions that summary judgment be entered in favor of the defendants.
 
 
 2
 Pursuant to provisions of New York law, a transportation bond issue was submitted to the voters of New York State for their approval or disapproval at a general election in 1971. The bond issue was a bipartisan matter; it garnered support from both sides of the aisle in the State Senate and Assembly which enacted it by a very substantial majority, subject to approval by the voters at the forthcoming 1971 election. Among its active supporters was then-Governor Rockefeller, who urged adoption of the bond issue as a source of jobs and as a catalyst for continued economic growth. New York history, however, has revealed that such bond issues are not something lightly approved by the voters. Indeed the 1971 issue was defeated at the polls, as was a subsequent issue put to a referendum vote in 1973. Suspecting the worst, the proponents of the 1971 bond issue organized Yes for Transportation in New York State, Inc. ('YES'), a not-for-profit corporation, to promote the bond issue. To this end YES reportedly expended some.$2.5 million on its campaign. Individual as well as corporate donations sustained YES in its work.
 
 
 3
 Among the corporate contributors was NYT in the amount of $50,000. As a business matter NYT, according to its directors, had more than a fleeting interest in the transportation bond issue. With over 12,000 vehicles in its motor pool, NYT was probably the largest private enterprise using the State's highways and roads. As the largest private employer in the state, it likewise had an interest in the quality of mass transportation, upon which many of its employees depend for travel between home and work. The Project on Corporate Responsibility, a shareholder of AT&T, nonetheless demanded that the directors of AT&T and NYT recover the contribution as having been made for a political purpose in violation of 460 of the New York Election Law. Relying on the opinion of counsel that the contribution did not violate 460, the directors of NYT denied the request. This action followed.[3]
 
 
 4
 In denying defendants' motion to dismiss or for summary judgment and in granting plaintiff's motion for summary judgment, the district court concluded that the contribution was barred by that portion of 460 which prohibits a corporate contribution 'for any political purpose whatever.' The court found that this phrase 'unambiguously include(d) an effort to influence the outcome of a vote on a question or proposition' and rejected defendants' argument that as so construed the statute would constitute an impermissible restraint on First Amendment rights. The court further held that 107 had also been violated, concluding that the required approval of the Public Service Commission had not been obtained.[4]
 
 
 5
 On appeal the defendant-directors challenge each of the district court's findings. They maintain that 460 does not prohibit a contribution in support of a non-partisan referendum; and that if the section did, it would be an unconstitutional restraint on a corporation's First Amendment rights. They also argue that the contribution did not offend 107. Finally, they charge that it was error in any event for the district court to imply a cause of action against them after they had acted in reliance upon the advice of counsel that the contribution would violate no provision of New York law and in a good-faith belief that the contribution would benefit the corporation.[5]
 
 I.
 
 6
 Section 460 of the Election Law plainly makes it a penal offense for a corporation to pay money to or in aid of 'any political party, committee or organization' or 'any candidate for political office'. These terms clearly do not apply to a referendum. The applicability of the section to NYT's contribution to YES turns on whether the statute's provision prohibiting corporate payments to any corporation or association organized or maintained 'for political purposes' or payments for 'any political purpose whatever' should be interpreted as barring a corporate expenditure in support of or in opposition to a public referendum that is essentially non-partisan in nature.
 
 
 7
 The fundamental issue before us is the meaning of the word 'political' as used in this context. Under the construction of 460 advanced by plaintiff, which was in the main accepted by the district court, any question submitted to the voters as the body politic for a vote would ipso facto become a 'political' matter, and any monies expended with respect to such a vote would therefore be spent for a 'political purpose.' Were the word being interpreted in vacuo, the district court might well have been justified in adopting the definition advocated by plaintiff, even though narrower meanings have been attributed to the word 'political.'[6] However, we are not here called upon to determine the meaning of the term in the abstract but its meaning in the context of a specific statute which, being penal, must be strictly construed, United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 5 L.Ed. 37 (1820); United States v. Fruit Growers Express Co., 279 U.S. 363, 49 S.Ct. 374, 73 L.Ed. 739 (1929); United States v. Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127 (1936); FCC v. American Broadcasting Co., Inc., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954) (applying this rule of construction to a criminal statute in a civil action). This time-honored rule is all the more compelling when First Amendment rights are involved. In such circumstances, where a word or phrase is reasonably capable of more than one meaning, we have repeatedly affirmed the wisdom of looking to the entire text of the statute and to its legislative history in order to ascertain, if possible, the intent of the drafters and the true scope and meaning of the term. See, e.g., Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring).
 
 
 8
 Following this traditional method of analysis, we are initially confronted with the fact that the phrase 'for any political purpose whatever,' as used in 460, does not stand alone. If it were the only qualifying predicate it might evidence an intent expansively to prohibit corporate contributions with respect to every possible type of legislative measure. The term, however, is used in 460 as a catchall phrase to terminate a list of specifically enumerated prohibitions limited to payments in aid of a 'political party' or 'candidate for political office.' The partisan flavor of these words is unmistakable. See United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); United States Civil Service Comm. v. National Assn. of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). It is a 'familiar canon of statutory construction that such (catchall terminating) clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated.' FMC v. Seatrain Lines, Inc., 411 U.S. 726, 734, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973). Application of that principle calls for an interpretation that would restrict the phrase 'for any political purpose whatever' to contributions of the type specifically described in the text immediately preceding it.
 
 
 9
 The legislative history of 460, furthermore, reveals that its drafters desired simply to prevent corruption of legislators and other elected officials through corporate contributions to political parties and candidates. No concern was expressed regarding corporate expenditures for expression of views with respect to measures that might be presented to the entire electorate for a vote. The genesis of what is today 460 can be traced to the efforts of Elihu Root in 1894 to amend the New York State Constitution to prohibit contributions to candidates for political office by large corporate malefactors of wealth. His proposed amendment, which closely resembled the language of 460 as finally enacted, provided as follows:
 
 
 10
 'No corporation shall directly or indirectly use any of its money or property for, or in aid of, any candidate for political office, or for nomination for such office, or in any manner use any of its money or property for any political purpose whatever, or for the reimbursement or indemnification of any person for moneys or property so used.' 3 Revised Record of the 1894 New York State Constitutional Convention 885 (1900) (hereafter '1894 Convention Record').
 
 
 11
 When fears were expressed by members of the Convention that the proposed amendment would prove too broad, Root distilled the essence and purpose of the amendment as follows:
 
 
 12
 'The idea of this section, Mr. Chairman, is to prevent the great moneyed corporations of the country from furnishing the money with which to elect members of the Legislature of this State in order that those members of the Legislature may vote to protect the corporations. It is to prevent the great railroad companies, the great insurance companies, the great telephone companies, the great aggregations of wealth, from using their corporate funds, directly or indirectly, to send members of the Legislature to those halls in order to vote for their protection and the advancement of their interests as against those of the public. It strikes, Mr. Chairman, at a constantly growing evil in our political affairs, which has, in my judgment, done more to shake the confidence of the plain people of small means of this country in our political institutions than any other practice which has ever obtained since the foundation of our government. And I believe that the time has come when something ought to be done to put a check to the giving of $50,000 or $100,000 by a great corporation toward political purposes, upon the understanding that a debt is created from a political party to it, a debt to be recognized and repaid with the votes of representatives in the Legislature and in Congress, or by the action of administrative or executive officers who have been elected in a measure through the use of the money so contributed.' 1894 Convention Record 894-95.
 
 
 13
 Thus the avowed objective was not to bar all corporate expenditures with respect to legislative matters generally but to prohibit corporate contributions to candidates or parties, since such contributions might tend to create political debts, obligating the legislators and public officers to reciprocate by favoring the special interest of the contributor rather than representing the will of the entire electorate. Root's concern was more than amply justified by the conduct of various corporate behemoths (including 'great telephone companies') in his own day, not unlike that currently the subject of national attention with respect to the financing of political parties and elections nationally. By 1906 the New York Legislature acted to curb the abuse by enacting the predecessor of 460.[7]
 
 
 14
 In all this legislative history we find no indication that the framers envisioned the application of 460 to referenda. The omission of any reference to referenda in the statute or in the legislative history is a pregnant one, for the Legislature elsewhere gave express consideration to referenda as a possible object of regulation and with obvious discrimination regulated disclosure of contributions with respect to referenda but rejected a proposed all-inclusive prohibition of contributions to referenda. In the same Session that saw the predecessor of 460 enacted, the Legislature passed Article 13 of the Election Law, 320 of which subjects to reporting requirements 'any committee or combination of three or more persons co-operating to aid or to promote the success or defeat of a political party or principle, or of any proposition submitted to vote at a public election . . ..'[8] The effect of this law was to make available to the public information as to all contributions in aid of referenda, which would be relevant to the voters' decision, but not to prohibit the financing of publicly-expressed views. Even more in point is the fact that the Assembly had before it is 1906 a proposal that would have explicitly prohibited contributions for 'any question to be voted on at an election.' Assembly Int. No. 84, Printed No. 77, 1906 New York State Assembly Journal, Vol. 1, p. 333. The Legislature rejected that proposal, choosing instead to enact a statute that tracked the 1894 proposal with the restrictive gloss given to it by Elihu Root.[9]
 
 
 15
 Thus the rubric of New York's Election Law as it emerged and has since developed confirms that when the Legislature desired to regulate contributions with respect to referenda, as it did in certain very limited respects, it did so by express reference. See in addition to 320 supra, N.Y.Election Law 440 and 441. Indeed if 460 were expansively construed, as plaintiff here urges, to bar corporate contributions with respect to referenda, any further regulation of the corporate financing of lobbying activities would be unnecessary, since such expenditures would be unlawful. Yet we find that 66 of the New York Legislative Law, McKinney's Consol.Laws, c. 32, which was enacted in 1906, a few days after the Legislature's adoption of 460, provides:
 
 
 16
 'every person retained or employed for compensation as counsel or agent by any person, firm, corporation or association to promote or oppose directly or indirectly the passage of bills or resolutions by either house or to promote or oppose executive approval of such bills or resolutions . . ..'
 
 
 17
 The New York Legislature thus implicitly recognized that corporations might lawfully pay compensation to others for the purpose of promoting the adoption of legislation, subject to public disclosure of the amounts so paid. Payments to promote the adoption of referenda by the voters are but one form of expenditure to encourage the adoption of legislation.
 
 
 18
 The reasons for this selective and limited regulation of referenda are not difficult to understand. By their very nature referenda, which have dealt principally with constitutional amendments and matters of governmental finance (see Manual of the Legislature of the State of New York, 1971-72, pp. 315-50), do not lend themselves to those corrupting influences which prompted the enactment of 460. Corporate funds paid to a candidate or political party have the potential of creating debts that must be paid in the form of special interest legislation or administrative action. In contrast, when the issue is one to be resolved by the public electorate monies paid by a corporation for public expression of its views create no debt or obligation on the part of the voters to favor the corporate contributor's special interest. Although large private companies have undoubtedly been tempted to 'buy' the election of political candidates in the expectation of receiving favors if their candidates should be elected, it is difficult to see how such motivation would play any substantial role in an attempt to influence votes for or against a referendum. The public remains completely free to reject the views of the corporate contributor, just as it did in the present case, without fear of retribution or non-support by the corporate contributor. The requirement of 320 that the corporation publicly disclose such expenditures minimizes the risk that the public will be misled as to the source or inspiration of the corporately-financed views.
 
 
 19
 Thus every sign from the legislative history and the statutory pattern of New York's Education Law persuades us that the Legislature did not intend the prohibition of 460 to extent to referenda, or at least not to referenda of a non-partisan nature as was the bond issue in question here. This belief is reinforced by the interpretation that the Attorney General of the State of New York has given to 460. While this court has been directed to no written opinion of the Attorney General on this matter, written opinions being limited to advice to governmental departments, the Attorney General as intervenor on this appeal informs us that he has consistently advised parties on an informal basis that 460 does not apply to referenda. We would be remiss were we not to accord this view of an agency charged with the responsibility for applying the law some weight in our deliberations. See Broadrick v. Oklahoma, 413 U.S. 601, 617-618, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Law Students Civil Rights Research Council, Inc. v. Wadmond, 401 U.S. 154, 163, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971).
 
 
 20
 Lastly it is incumbent upon us to construe 460, to the extent possible, in a manner that will not transgress constitutional rights, United States v. CIO, 335 U.S. 106, 121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948); United States v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909), including those of corporate contributors which, like individuals, are guaranteed freedom of speech and petition. See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137-138, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); United States v. CIO, 335 U.S. 106, 154-155, 68 S.Ct. 1349 (Rutledge, J., concurring) (1948); Grosjean v. American Press Co., Inc., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936). It is difficult to imagine a setting where a narrow interpretation would be more appropriate than when a criminal statute might otherwise impinge on First Amendment rights. See United States v. Robel, 389 U.S. 258, 262, 265, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); United States v. Rumely, 345 U.S. 41, 45-47, 73 S.Ct. 543, 97 L.Ed. 770 (1953); United States v. National Committee for Impeachment, 469 F.2d 1135, 1140-1141 (2d Cir. 1972). In adopting a narrow interpretation of 460 we are but following the example set by the Supreme Court in its encounters with the Corrupt Practices Act, the federal analog of 460.[10] Concerned with the serious constitutional doubts that would afflict a broad interpretation of the federal statute's prohibition of contributions or expenditures in support of a political candidate, the court has consciously opted for a restrictive reading of the statute's words.[11] There is even greater cause for constitutional concern in the present case, for the plaintiff's broad construction of 460 would proscribe corporate contributions or expenditures for the purpose of communicating its views to the public with respect to an important issue to be decided by the voters and furnishing information that might be of assistance in arriving at that decision. 'Since corporations must usually expend moneys to communicate their views,' First Natl. Bank of Boston v. Attorney General, Mass., 290 N.E.2d 526, 534 (1972), the effect of the district court's interpretation would be to inhibit such expression.
 
 
 21
 Whatever the justification for prohibiting contributions that are prone to create political debts,[12] it largely evaporates when the object of prohibition is not contributions to a candidate or party, but contributions to a public referendum. The spectre of a political debt created by a contribution to a referendum campaign is too distant to warrant this further encroachment on First Amendment rights. Against a background on such attenuated danger we decline here, as we did in United States v. National Committee for Impeachment, 469 F.2d 1135, 1142 (1972), to ascribe to the legislators an intention to regulate, perchance prohibit, the expression of opinion on fundamental issues of the day.[13]
 
 
 22
 Accordingly, we conclude that NYT's contribution to YES in support of a non-partisan referendum does not come within the proscription of 460.
 
 II.
 
 23
 The district court in deciding that NYT violated 107 of the New York Public Service Law (which prohibits a public utility 'except with the consent and approval of the public service commission' from using revenues from public service for purposes other than operating expenses) did not have the benefit of the Public Service Commission's decision handed down a few days later on April 5, 1973, which held that NYT's $50,000 contribution to YES did not violate 107. In reaching its conclusion the Commission noted that the principal purpose of 107, as revealed in the Commission's 1934 Annual Report and in the Governor's contemporaneous messages to the Legislature urging passage of the law, is to prevent utilities from diverting funds to recoup losses of affiliated companies. It acknowledged that over the years it had implicitly consented to and approved expenditures of the type here at issue, at least where they represented a minor portion of a utility's total expenditures, and had dispensed with the necessity of issuing a specific consent in each instance, since to interpret 107 as requiring a detailed piecemeal scrutiny might inhibit utilities in the exercise of their constitutional right of free expression with respect to matters of public interest, including proposed legislation, constitutional amendments, or other causes. The Commission further took note of NYT's statement, apparently not disputed, that since NYT had non-utility operating revenues in excess of $50,000 in 1971, the contribution to YES did not in any event violate 107, since it did not involve use '(of) revenues received from the rendition of public service within the state.' This authoritative pronouncement of the Commission on the interpretation of 107 in what is obviously a carefully considered opinion is entitled to our 'respectful consideration.' Law Students Civil Rights Research Council, Inc. v. Wadmond, 401 U.S. 154, 163, 91 S.Ct. 720 (1971) (quoting from Fox v. Standard Oil Co., 294 U.S. 87, 96, 55 S.Ct. 333, 79 L.Ed. 780 (1935)); Broadrick v. Oklahoma, 413 U.S. 601, 617-618, 93 S.Ct. 2908 (1973).
 
 
 24
 In its opinion the district court implied that since NYT's contribution to YES would be disallowed as an operating expense for rate-making purposes, it cannot satisfy the requirements of 107. We believe that this approach confuses two distinct concepts: (1) ratemaking and (2) contributions by utilities. Although an expenditure is not allowable for purposes of establishing rates, as was the case here, it may still be approved by the Commission pursuant to 107. Indeed some contributions are allowed for rate-making purposes. See New York State Elec. & Gas Corp., 20 P.U.R. (n.s.) 388, 397 (1937) (expenditures to oppose certain legislation); N.Y. Tel. Co., 84 P.U.R.2d 321, 349-50 (1970) (charitable contributions).
 
 
 25
 There is nothing in the history of 107 or in the past practice of the Commission to suggest that its construction of the section is other than correct[14] We conclude that the district court erred in holding that the NYT contribution violated 107.
 
 III.
 
 26
 Since we conclude that neither 460 of the Election Law nor 107 of the Public Service Law were violated, it becomes unnecessary to decide whether, assuming a violation, a private derivative right of action may be implied in favor of plaintiff. There remains the suggestion that the contribution might nonetheless be ultra vires as an unauthorized act. For this proposition plaintiff relies upon People ex rel. Perkins v. Moss, 187 N.Y. 410, 80 N.E. 383 (1907). While the court there did say that a corporation did not have the right to make a contribution to a political campaign, it had before it a contribution to a party, not a referendum. In any event, statutory enactments have overtaken this holding insofar as it might apply to support for a non-partisan referendum. To the extent that NYT's contribution was prompted by a concern for the state of transportation and its multiplier effects on the economy as a whole, it is protected now by the words of N.Y.Business Corporation Law 202(a)(12), McKinney's Consol.Laws, c. 4 which authorize a corporation 'to make donations, irrespective of corporate benefit, for the public welfare (and for) civic or similar purposes . . ..' To the extent that the contribution was prompted by an appreciation of the business benefits for NYT to be derived from better roadways and transporation, it comes within the traditional corporate benefit rule. See N.Y.General Corporation Law 34, McKinney's Consol.Laws, c. 23. In short, we see no basis for an ultra vires argument on the facts of this case.
 
 
 27
 The decision of the district court is reversed with directions to enter judgment in favor of the defendants.
 
 MULLIGAN, Circuit Judge (dissenting):
 
 28
 * New York Telephone Co. (NYT) made a $50,000 contribution to 'Yes for Transportation in New York State,' a not-for-profit corporation organized for the sole purpose of promoting the passage of the transportation bond proposition which was submitted to the electorate of the State of New York at the general election of 1971. New York Election Law 460 (McKinney Supp.1973) prohibits any corporation doing business in this State from making any payment to aid any corporation organized for political purposes or 'for any political purpose whatever.' 'YES,' which had as its nominal corporate purpose the improvement of the quality of mass transportation in New York State, was in fact (and this is not disputed) an ad hoc organization dedicated to securing the passage of the transportation bond issue at the 1971 election. It seems to me to be clear, therefore, that the payment of $50,000 by NYT to YES was a transaction prohibited by the unambiguous language of Section 460 and that Judge Carter was correct in so holding.
 
 
 29
 The majority here concludes that the court below was in error because the statute was not intended to be applicable to a referendum which has bipartisan support, but should be construed to include only partisan political contributions. In support of its position, the majority seeks to avoid the language which bars corporate contributions 'for any political purpose whatever' by resort to the familiar ejusdem generis principle of statutory construction. It is true that Section 460 condemns payments in aid of a 'political party' or a 'candidate for political office,' terms which have an unmistakable partisan connotation. However, the language of the statute preceding the omnibus clause also proscribes gifts to 'any corporation, joint-stock or other association organized or maintained for political purposes.' We cannot assume that this language is merely repetitious or surplusage. It goes beyond donation to the traditional partisan political party and encompasses compasses payments to an entity created to achieve a political purpose. YES seems to me to be precisely such an animal. While support for the bond issue might well, and did, include individuals of varying political party affiliation, YES was obviously a fiercely 'partisan' apparatus devoted to influencing the outcome of an eleltion-- the passage of a proposition submitted to the body politic. It is thus truly political in the generic and primary sense of that term. See note 6 of the majority opinion, supra.
 
 
 30
 To support its restrictive interpretation of Section 460, the majority also depends upon its legislative history, relying in great measure upon the comments of Elihu Root at the State Constitutional Convention in 1894 urging the passage of an amendment to the Constitution of the State of New York, which the majority considers to be the progenitor of Section 460. In response, it might be sufficient to note that Root's observations were made 12 years before the passage of Section 460 and then to a different body organized for a different purpose. However, it is more significant to recognize that the Root amendment was limited to payments to candidates for political office, and, while it did have the existing omnibus clause, no language in his amendment referred even to payments to a 'political party,' much less to 'any corporation, joint-stock or other association organized or maintained for political purposes.' Hence, it is not surprising at all that the primary thrust of Root's remarks at the Convention in 1894 were directed to the evil of the purchase of legislators by corporate malefactors in order to advance their selfish interests at the expense of the public. The New York Legislature in 1906 broadened the scope of the prohibition to include political parties and organizations maintained for political purposes. Therefore, I see no point in the argument that Root's remarks in support of a narrow constitutional amendment are relevant in construing a statute enacted 12 years later with patently broader coverage.
 
 
 31
 The 1906 legislation was proposed not by Root, but by a Joint Committee Appointed to Investigate Life Insurance Companies, and I find no reference in its report to the 1894 convention debate. In its report the committee stated:
 
 
 32
 Contributions by insurance corporations for political purposes should be strictly forbidden . . .. Whether made for the purpose of supporting political views or with the desire to obtain protection for the corporation, these contributions have been wholly unjustifiable. In the one case executive officers have sought to impose their political views upon a constituency of divergent convictions, and in the other they have been guilty of a serious offense against public morals . . .. Not only should it be expressly prohibited and treated as a waste of corporate moneys, but any officer, director or agent making, authorizing or consenting to any such contribution should be guilty of a misdemeanor . . ..
 
 
 33
 Report of the Joint Committee of the Senate and Assembly of the State of New York Appointed to Investigate the Affairs of Life Insurance Companies, Assembly Doc. No. 41, at 20 (1906).
 
 
 34
 It is noteworthy that this Committee was concerned with the waste of corporate assets to impose political views upon a constituency of divergent opinions. Section 460 is not only designed to prevent the crudity of the corporate purchases of politicians, but also to thwart the influencing of elections and the propagation of political principles with corporate assets without stockholder consent. The use of the corporate treasury to influence the passage of a.$2.5 billion bond issue would seem to be logically as offensive as such use to influence the election of an assemblyman.
 
 
 35
 The majority finds further support for its restrictive interpretation of Section 460 in the Assembly's failure, in 1906, to adopt a proposal that would have explicitly prohibited contributions for 'any question to be voted on at an election.' Assembly Int. No. 84, Print. No. 77, 1906 New York State Assembly Journal, Vol. 1, p. 333. It preferred instead, we are advised, to enact a statute that tracked the 1894 proposal 'with the restrictive gloss given to it by Elihu Root.' As we have already indicated, Section 460 did not track the Root amendment; it gave it pertinent here. scope which makes it pertinent here. Hence, it is just as reasonable to hypothesize that the reason for the 'rejection' of the proposal was that the Assembly considered referenda already included in Section 460.[1]
 
 
 36
 The position taken by the majority that the interpretation of Section 460 given below and adopted in this dissent would make New York Legislative Law 66 (McKinney 1952), also enacted in 1906, unnecessary, reflects a basic confusion between the constitutional rights of speech and petition, which I submit are not involved here, and the corporate contribution of funds to candidates, parties and organizations created for political purposes which Section 460 prohibits. Section 66 recognizes the right of the corporation to retain lobbyists to promote or oppose the passage of bills or resolutions 'by either house or to promote or oppose executive approval of such bills or resolutions.' No one denies, however, that a corporation may have the constitutional right to express its views and to petition the legislature. See, e.g., Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137-138, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (freedom of petition); Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (freedom of expression). Section 460 was never intended to interfere with these rights and, in any event, the New York courts would construe the provision to avoid the conclusion that it is unconstitutional. In re Coates, 9 N.Y.2d 242, 253, 213 N.Y.S.2d 74, 82-83, 173 N.E.2d 794, appeal dismissed, 368 U.S. 34, 82 S.Ct. 147, 7 L.Ed.2d 91 (1961). Section 460 attacks the use of the corporate treasury to finance candicates, parties or organizations formed for political purposes, which was the role played by YES. There is no case cited by any litigant here which has held that such legislation is unconstitutional. In fact, the distinction between the corporate right to expression and the use of the corporate treasury to make payments to political organizations is implicit in the holdings of the Supreme Court. See United States v. UAW-CIO, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); United States v. CIO, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). See also United States v. Painters Local No. 481, 172 F.2d 854 (2d Cir. 1949). It is difficult to see why contributions to political organizations formed to influence referenda make the statute any more vulnerable than its admitted application to payments to candidates or partisan political parties. The only cases in which the Supreme Court has found it significant that regulation of political activities was limited to partisan politics have not involved business corporations, but rather government employees, where the only legitimate regulatory purpose was the preservation of a non-partisan work force. See Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).
 
 
 37
 The majority also contends that so-called bipartisan or apolitical referenda do not lend themselves to the corrupting influences which prompted the enactment of Section 460. Once again we must reject the premise which underlies the argument. Elihu Root's concerns in 1894 were much more narrow than those expressed by the Joint Committee in 1906 which introduced the present statute, which is so much broader than the earlier proposed constitutional amendment. The report of the Joint Committee in 1906 demonstrates its twin concerns that the treasuries of the corporate behemoths were being utilized to bring a disproportionate influence on public elections, and that this further represented a waste of corporate assets without the consent of stockholders whose political views might well differ from those of the directors. Similar concerns have prompted analogous legislation.[2] Recent history would indicate that legislative concern over corporate political contributions has not been unwarranted.
 
 
 38
 The support by the corporate defendants here of the.$2.5 billion bond issue to finance highway construction and mass transportation is well within the ambit of the legislative concern that prompted Section 460. This proposition was not a moot question or an academic quibble. It was perhaps the most bitterly contested issue of the 1971 campaign. YES was reported to have as its aim the accumulation of a war chest of.$2.5 million. In addition to NYT, other public utilities were contributors-- Consolidated Edison ($25,000) and Long Island Lighting Co. ($12,500).[3] It is difficult to avoid the conclusion that this 'nonpartisan' referendum possessed the same potential for corporate abuse as any other political campaign.
 
 
 39
 We are further urged that the construction given to the statute by the Attorney General, who is responsible for the enforcement of the Election Law, and which is in accord with the position of the corporate appellants here, should be entitled to consideration. The principle that some weight is due a contemporaneous and long-standing interpretation of an ambiguous statute by those charged with its enforcement is not disputed. Nevertheless, the rule cannot be blindly applied. Here the New York Attorney General's Office was not involved with the drafting of the statute and has represented only that its views have been 'occasionally expressed by the New York State Law Department' and that all such expressions have been 'oral.' See Investment Co. Institute v. Camp, 401 U.S. 617, 626-628, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); In re Chin Thloot Har Wong, 224 F.Supp. 155, 164-165 (S.D.N.Y.1963) (Feinberg, J.); compare Broadrick v. Oklahoma, supra, 413 U.S. at 617-618, 93 S.Ct. 2908; Law Students Civil Rights research Council, Inc. v. Wadmond, 401 U.S. 154, 163, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971). In any event, I believe the Attorney General's interpretation of the statute, is contrary to the legislative history and I find no justification, constitutional or logical, for excluding referenda from its operation.[4] See In re Chin Thloot Har Wong, supra, 224 F.Supp. at 165; Payson v. Caputa, 9 A.D.2d 226, 235, 193 N.Y.S.2d 166, 173 (1st Dep't 1959).
 
 
 40
 I therefore concur in Judge Carter's conclusion that the statute plainly encompasses the activity complained of here, although I would agree with the majority that as far as the individual liability of the directors for damages is concerned, the question of their reliance upon advice of counsel should be remanded for trial.
 
 II
 
 41
 The court below found that NYT violated New York Public Service Law 107 (McKinney 1955) which provides:
 
 
 42
 Except with the consent and approval of the public service commission first had and obtained, no public utility shall use revenues received from the rendition of public service within the state for any purpose other than its operating, maintenance and depreciation expenses, the construction, extension, improvement or maintenance of its facilities and service, the payment of its indebtedness and interest thereon, and the payment of dividends to its stockholders.
 
 
 43
 The majority reverses on this issue primarily because it relies upon an opinion of the Public Service Commission, which was issued not only after the opinion below was filed, but in an administrative proceeding brought by consumers who apparently have no relationship to the plaintiffs here. I agree with the majority that if the funds used by NYT were not revenues received from the rendition of public service, then Section 107 has no application. However, the appellants have never raised that defense in this case, and there is nothing in the record before us to indicate that this is the fact. The Commission opinion relied upon makes no such finding; it simply recites that in its reply in the administrative proceeding, NYT contended 'that the Company had non-telephone revenues in excess of the amount donated and therefore operating revenues need not have been used for the donation.' The Commission makes no further comment about this defense; it cannot be considered to be a finding and by no means can it be termed an 'authoritative pronouncement of the Commission.' The fact that NYT's non-utility revenues exceeded $50,000 in no way establishes that the gift came from these sources. Presumably NYT incurred other charges against these fees, and without at least an accounting or a hearing, I see no basis at all to reverse on the assumption that Section 107 is inapplicable because non-utility revenue existed.
 
 
 44
 The transaction questioned falls exactly within the statute. There was concededly no consent of the Commission 'first had and obtained' and it cannot be seriously argued that the contribution was an operating or maintenance cost. This is implicit in the Commission's opinion since it emphasizes that the payments could not be reflected in the company's rates. While this is some solace to consumers, it is hardly relevant in a stockholder derivative action.
 
 
 45
 The Commission with the benediction of the majority seeks to avoid the plain language of the statute by referring to its legislative history and purpose. As Chief Judge Kaufman has recently observed in American Airlines, Inc. v. Remis Industries, Inc., 494 F.2d 196, 198, (2d Cir. 1974), 'it is a well-settled principle of statutory construction that the plain language of a statute offers the primary guidance to its meaning.' Moreover, he there pointed out the controlling New York law, quoting from Meltzer v. Koenigsberg, 302 N.Y. 523, 525, 99 N.E.2d 679 (1951):
 
 
 46
 '(Where) the language found in the statute is clear and unambiguous, . . . the intent of the framers 'is to be sought first of all, in the words and language employed, and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation.' McCluskey v. Cromwell, 11 N.Y. 593, 601-602.'
 
 
 47
 494 F.2d at 198-199. The law is no different because an agency has disregarded which it operates is entitled to respect, People ex rel. West Side Elec. Co. v. Consolidated Tel. & Elect. Subway Co., 187 N.Y. 58, 67, 79 N.E. 892 (1907), and the 'administrative construction given to a statute may not in itself create an ambiguity . . ..' Del Giorno v. Police Dep't, 33 App.Div.2d 665, 305 N.Y.S.2d 63, 64-65 (1st Dep't 1969).
 
 
 48
 The Commission states that in the past it has countenanced 'minor expenses' in the nature of donations (charitable contributions and advertising expenses) without precisely checking the source of the funds used and without requiring prior consent and approval. This, the Commission says, would result in inefficient use of the Commission's revenues. Moreover, the Commission believes that 'the free expression of opinion in our society should not be discouraged.' The test of 'minor expenses' is whether they will have 'little or no effect upon a utility's financial stability.' What the Commission in sum is saying is that it has disregarded the mandate of the statute in the past and will continue to do so. While the interpretation by an agency of a statute under which it operates is entitled to respect, this can hardly mean that a history of disrespect becomes acceptable custom and usage. The belief of the Commission in free speech is indeed salutary but, as we have indicated, that is not involved here. Section 107 does not prohibit free speech; it simply requires that non-operating expenses be first cleared by the Commission. The Commission's determination that only such expenses as would affect the financial stability of the utility are within the statute, considering the enormous assets of the public utilities, can hardly be considered a de minimis accommodation with the legislative mandate.
 
 
 49
 I would therefore affirm except as to the question of director liability which I would remand for trial.
 
 
 
 [1]
 460 of the N.Y. Election Law reads:
 '460. Political contributions prohibited; penalty; witnesses' privilege.
 'No corporation or joint-stock association doing business in this state, except a corporation or association organized or maintained for political purposes only, shall directly or indirectly pay or use or offer, consent or agree to pay or use any money or property for or in aid of any political party, committee or organization, or for, or in aid of, any corporation, joint-stock or other association organized or maintained for political purposes, or for, or in aid of, any candidate for political office or for nomination for such office, or for any political purpose whatever, or for the reimbursement or indemnification of any person for moneys or property so used. Any officer, director, stock-holder, attorney or agent of any corporation or joint-stock association which violates any of the provisions of this section, who participates in, aids, abets or advises or consents to any such violation, and any person who solicits or knowingly receives any money or property in violation of this section, shall be guilty of a misdemeanor.'
 
 
 [2]
 107 of the N.Y. Public Service Law reads:
 '107. Approval of the use of revenues.
 'Except with the consent and approval of the public service commission first had and obtained, no public utility shall use revenues received from the rendition of public service within the state for any purpose other than its operating, maintenance and depreciation expenses, the construction, extension, improvement or maintenance of its facilities and service, the payment of its indebtedness and interest thereon, and the payment of dividends to its stockholders.'
 
 
 [3]
 The present named plaintiff reinstituted the suit in the place of the Project after it was pointed out that the Project was not a shareholder of AT&T at the time of the act in question. See F.R.Civ.P. 23.1(1)
 
 
 [4]
 Following the district court's grant of summary judgment on March 26, 1973, the New York State Public Service Commission on April 5, 1973, concluded that the NYT contribution did not violate 107. See infra
 
 
 [5]
 The facts surrounding these allegations are not fully developed in the affidavits supporting the motions below. The motion papers nonetheless put in issue the general question of the reasonableness of the contribution and the business judgment of the directors in making the contribution. Were it not for the fact that we find no violation of the statutes as alleged, we would at a minimum be constrained to remand the case for trial on the issues of the reasonableness of the directors' actions, see Simon v. Socony-Vacuum Oil Co., Inc., 179 Misc. 202, 38 N.Y.S.2d 270 (Sup.Ct.1942), affd. without opin., 267 App.Div. 890, 47 N.Y.S.2d 589 (1st Dept.1944), and their reliance on the advice of counsel, see Spirt v. Bechtel, 232 F.2d 241 (2d Cir. 1956)
 
 
 [6]
 See Webster's Third New International Dictionary (1961) definitions of 'political' and 'politics.'
 'political . . . 1a: of or relating to government, a government, or the conduct of governmental affairs; b: of or relating to matters of government as distinguished from matters of law . . . c: engaged in civil as distinguished from military functions . . . d: of, relating to, or concerned with the making as distinguished from the administration of governmental policy . . . 3a; of, relating to, or concerned with politics; b: of, relating to, or involved in party politics . . ..' 'politics . . . 1a: the art or science of government: a science dealing with the regulation and control of men living in society: a science concerned with the organization, direction, and administration of political units (as nations or states) in both internal and external affairs: the art of adjusting and ordering relationships between individuals and groups in a political community; b(1): the art or science concerned with guiding or influencing governmental policy . . . 4a(1): political affairs or business; specif: competition between competing interest groups or individuals for power and leadership (2): activities concerned with governing or with influencing or winning and holding control of a government . . . (3): activities concerned with achieving control, advancement, or some other goal in a nongovernmental group (as a club or office) . . ..'
 
 
 [7]
 The 1906 enactment was prompted by a Report of the Joint Committee of the Senate and Assembly of the State of New York Appointed to Investigate the Affairs of Life Insurance Companies (1906), which detailed instances of corporate contributions for political purposes. Each contribution cited by the Report was to a political candidate or party, not to a referendum or similar issue
 The forebear of 460 was enacted as part of the General Corporation Law. In 1928 it was transferred from the Corporation Law to the Penal Law. In 1965 it came to rest in the Election Law as 460.
 
 
 [8]
 The definition of 'political committee' in 320 applies only 'under the provisions of this article (13)' and not to the term as used in 460
 
 
 [9]
 Plaintiff-shareholder suggests that the legislature simply rejected the specific but limiting formulation of 'any question to be voted on' in favor of the even broader language, 'for any political purpose whatever.' The shareholder forgets that the Root 1894 proposal contained the same 'broad' language relating to 'any political purpose whatever.' The legislature may well have preferred the Root formulation precisely because Root had successfully answered the charges that his prohibition would be too broad
 
 
 [10]
 18 U.S.C. 610
 
 
 [11]
 See United States v. CIO, 335 U.S. 106, 68 S.Ct. 1349 (1948) (to avoid gravest doubt as to its constitutionality, statute held not to prohibit union from endorsing candidate in its regularly published newsletter); see also Pipefitters v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972) ('despite its broad language' statute held not to prohibit union from making political expenditure if the monies have been volunteered by its members). But see United States v. UAW-CIO, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) (statute held to prohibit use of union dues to sponsor commercial television broadcasts endorsing political candidates). In each of these cases the Court studiously avoided any ruling on the constitutionality of the statute as construed
 
 
 [12]
 See Justice Frankfurter's apologia for the Corrupt Practices Act in United States v. UAW-CIO, 352 U.S. 567, 571-573, 77 S.Ct. 529 (1957), where he surveys the legislative history of 460 and the concern with political debts
 
 
 [13]
 Section 460 provides that no corporation 'shall directly or indirectly pay or use or offer . . . any money or property . . . for any political purpose whatever . . ..' If the statute were interpreted to cover referenda, a corporation would apparently be prohibited from using its funds even indirectly to express its views on a referendum. To avoid this constitutional dilemma, even the plaintiff-shareholder would construe the words of the statute narrowly to permit a corporation in the course of its regular communications with its shareholders or customers to espouse a position on a proposed election issue. Our interpretation would permit direct expenditures for the same purpose
 
 
 [14]
 It has long been the practice of the Commission not to require approval of contributions directed toward bettering social and economic conditions in the service areas of the utilities. Buffalo General Elec. Co., 6 P.U.R. (n.s.) 345, 354-57 (1934)
 
 
 [1]
 The contention that the Assembly made a conscious choice between the proposals is not tenable. Actually, the bill referred to by the majority was introduced by a Mr. Wainwright and, on February 14, 1906, was referred to the Judiciary Committee of the Assembly where it died. 1906 New York State Assembly Journal 333. Section 460, on the other hand, was the product of the Joint Committee on Insurance which introduced the identical legislation in both the Senate and the Assembly on February 22, 1906. See 1906 New York State Assembly Journal 461-62; 1906 New York State Senate Journal 251-52. In the Assembly the bill was referred to the Insurance Committee. The Senate was the first to act on the legislation and sent its bill to the Assembly which concurred on April 12, 1906. 1906 New York State Assembly Journal 2222-23. In view of the sponsorship of Section 460 and the Senate's action, the demise of the Wainwright bill in the Judiciary Committee of the Assembly is attributable to natural political causes. There is no evidence that the bill was rejected because of the Assembly's determination that referenda should be excluded from its coverage
 
 
 [2]
 See, e.g., United States v. CIO, 355 U.S. 106, 113, 68 S.Ct. 1349 (1948) which determined that similar considerations underlie Congress' adoption of the Federal Corrupt Practices Act. See also Comment, 70 Yale L.J. 821, 836 & nn. 106-09 (1961) suggesting that these are the same reasons for state legislation in this area
 
 
 [3]
 While the appellants urge that their contribution was motivated by their interest in good highways which are essential to the operation of their business, the position of the appellees seems to be that the motivation of NYT was to curry favor with the Governor, who was totally devoted to the passage of the proposition and whose Appointments Secretary resigned to head up YES. They find it sinister that the three identified public donors were in the same year seeking rate increases from the Public Service Commission whose members are appointed by the Governor. There is no evidence at all to support their suspicions and we do not question the motivation of any of the parties involved. In any event, the application of the statute does not depend upon the purity of the donees or the probity of the donors. It is the opportunity for abuse created by the contribution which the statute seeks to avoid
 Since we are told by the majority that 'the requirement of (New York Election Law) 320 that the corporation publicly disclose (expenditures to influence referenda) minimizes the risk that the public will be misled as to the source or inspiration of the corporately-financed views,' it is significant that YES has not reported or disclosed the sources of its income and has successfully resisted a legal action seeking to obtain this information. Mr. Justice Chimera in Olivieri v. YFT (Sup.Ct., N.Y.Co. 23408/71) held that since YES was a corporation, it could not be a 'political committee' within the meaning of Section 320 subject to the reporting provisions of Section 321. There seems little doubt that the New York Court of Appeals would reach the same result. See Vannier v. Anti-Saloon League, 238 N.Y. 457, 144 N.E. 679 (1924). This would seem to provide all the more reason that the contribution in question be within Section 460.
 
 
 [4]
 The rule that penal statutes are to be strictly construed does not aid the appellants here. 'The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases, which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend.' United States v. Wiltberger, 18 U.S. (5 Wheat.) 35, 43, 5 L.Ed. 37 (1820); see Precise Imports Corp. v. Kelly, 378 F.2d 1014, 1017 (2d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); Cotheal v. Brouwer, 5 N.Y. 562, 567-568 (1851)